689 F.2d 840
 1982-2 Trade Cases 64,970
 John HAHN, Wade Liggett, Joseph Aizawa, et al., Plaintiffs-Appellants,
v.
OREGON PHYSICIANS SERVICE, et al., Defendants-Appellees.
John HAHN, V. G. Livingstone, Hige Aizawa, et al.,
Plaintiffs-Appellants,
v.
Josephine M. DRISCOLL, Acting Insurance Commissioner of the
State of Oregon, Defendants-Appellees.
Lawrence HELTON, David Hoyal, Wade Liggett, et al.,
Plaintiffs-Appellants,
v.
ROGUE VALLEY PHYSICIANS' SERVICE, et al., Defendants-Appellees.
Lawrence HELTON, David Hoyal, et al., Plaintiffs-Appellants,
v.
GREATER OREGON HEALTH SERVICES, Defendant-Appellee.
 No. 81-3173.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 4, 1982.
Decided Oct. 5, 1982.
 
 Frank R. Morrison, Jr., Bassett, Gemson & Morrison, Seattle, Wash., for plaintiffs-appellants.
 William B. Crow, Miller, Anderson, Nash, Yerke & Wiener, Portland, Or., Thomas M. Triplett, Souther, Spaulding, Kinsey, Williamson, & Schwabe, Portland, Or., for defendants-appellees.
 Appeal from the United States District Court for the District of Oregon.
 Before KENNEDY, FARRIS and NORRIS, Circuit Judges.
 FARRIS, Circuit Judge:
 
 
 1
 Plaintiff-podiatrists filed four separate actions in September 1978 alleging that the defendants conspired or combined to boycott podiatrists in favor of other physicians in violation of the Clayton Act, 15 U.S.C. § 12 et seq., and the Sherman Act, 15 U.S.C. § 1 et seq. After initial discovery the defendants moved for summary judgment and the district court granted the motion on February 27, 1981. Hahn v. Oregon Physicians' Service, 508 F.Supp. 970 (D.Or.1981). We reverse and remand for further proceedings.
 
 I. FACTS
 
 2
 Plaintiffs are doctors of podiatric medicine licensed to practice in Oregon. Or.Rev.Stat. § 682.020. Defendants are providers of prepaid health insurance. The defendants include state regulated health care contractors, Or.Rev.Stat. § 750.005(2)(a); federally regulated health maintenance organizations, 42 U.S.C. § 300e; and a federally regulated individual practice association, 42 U.S.C. § 300e-1(5). The plaintiffs challenge three of the defendants' practices: (1) insureds are required to obtain certain podiatric services exclusively from medical doctors; (2) insureds are not reimbursed for treatment by a podiatrist unless they are referred by an M.D.; and (3) podiatrists are not allowed to be members of defendant health-care associations. The effect of the latter practice is that podiatrists are reimbursed for their services at a lower rate than are members of the defendant organizations.
 
 
 3
 The district court granted the defendants' summary judgment motion, finding that the McCarran-Ferguson Act, 15 U.S.C. § 1011 et seq., exempts defendants from antitrust liability and that the plaintiffs failed to meet the interstate commerce jurisdictional requirement of the Sherman Act.
 
 II. DISCUSSION
 A. McCarran-Ferguson Act
 
 4
 The threshold issue is whether the district court was correct in finding the challenged activities of the defendant health-care providers exempt from antitrust laws under the McCarran-Ferguson Act, 15 U.S.C. § 1012(b). We reverse this ruling. The exemption is inapplicable upon the facts in issue.
 
 1) Introduction
 
 5
 The primary purpose of the McCarran-Ferguson Act is to allow for state regulation of the activities of insurance companies. 15 U.S.C. § 1011 et seq. A secondary purpose is to give insurance companies limited immunity from antitrust laws. See Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 218 & n.18, 99 S.Ct. 1067, 1077 & n.18, 59 L.Ed.2d 261 (1979). To qualify for an exemption from the federal antitrust laws, the anticompetitive practices 1) must be part of the "business of insurance," 2) must be regulated by state law, and 3) may not take the form of coercion, intimidation, or boycott. See 15 U.S.C. §§ 1012(b) and 1013(b). The pivotal question is whether the defendants' activities were part of the "business of insurance."
 
 2) Precedent
 
 6
 The Supreme Court limited the scope of the antitrust exemption in Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979), by narrowly defining the statutory term "business of insurance." The Court recently reaffirmed this holding. Union Labor Life Insur. Co. v. Pireno, --- U.S. ----, ----, ----, 102 S.Ct. 3002, 3006-08, 73 L.Ed.2d 647 (1982). In Royal Drug independent pharmacists filed an antitrust action against Blue Shield, a health insurer, and several participating pharmacies challenging provider-agreements. The defendants contended that the provider contracts were not subject to the federal antitrust laws because the provider contracts constituted the "business of insurance" and were therefore exempt under the McCarran-Ferguson Act. The Supreme Court disagreed and in its ruling adopted a narrow interpretation of the statutory language, the "business of insurance."
 
 
 7
 In holding that the pharmacy agreements were not the "business of insurance" within the meaning of § 2(b), the Court based its ruling in part on the common understanding of that term. Royal Drug, 440 U.S. at 211, 99 S.Ct. at 1073. The Court identified three relevant criteria for determining if a business practice is part of the "business of insurance:" "first, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry." Union Labor Life Insurance Co. v. Pireno, --- U.S. ----, ----, 102 S.Ct. 3002, 3008, 73 L.Ed.2d 647 (1982). See also Royal Drug, 410 U.S. at 211-12, 215, 231, 99 S.Ct. at 1073, 1075, 1083.
 
 
 8
 The insurance contract involves a contractual relationship which exists when an insurer, for consideration, agrees to reimburse an insured for loss caused by designated contingencies. See Black's Law Dictionary 721 (5th Ed. 1979). This underwriting and subsequent spreading of the policyholder's risk is the primary element of the insurance contract and is, therefore, the "business of insurance." Royal Drug, 440 U.S. at 211, 99 S.Ct. at 1073. The Court in Royal Drug recognized that the provider contracts neither served to spread the risk nor to define the peril, but were merely a cost-cutting device for the insurers. Id. at 214-15, 99 S.Ct. at 1074-75. The provider contracts established an "arrangement for the purchase of goods and services" that reduced the insurer's cost of covering the loss that it was obligated to cover under the insurance contract. Id. at 214, 99 S.Ct. at 1074.[1] The Court concluded that this primary element of risk-spreading was missing in the provider agreements.
 
 
 9
 The Court in Royal Drug also found that the provider agreement was not an "integral part of the contract between the insurer and the insured," 440 U.S. at 215-16, 99 S.Ct. at 1075, and that it involved entities outside the insurance industry. Id. at 224, 231, 99 S.Ct. at 1080, 1083. See Pireno, --- U.S. at ----, 102 S.Ct. at 3008.
 
 
 10
 Circuit courts have consistently applied the narrow definition of "the business of insurance" enunciated in Royal Drug. In an analogous case, Virginia Academy of Clinical Psychologists v. Blue Shield of Virginia, 624 F.2d 476 (4th Cir. 1980), cert. denied, 450 U.S. 916, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981), an organization of psychologists and an individual practicing psychologist brought a Sherman Act action against Blue Shield plans and a medical society because the plans refused to reimburse insureds for services rendered by clinical psychologists unless the services were billed through a physician. The court held that the defendants' activities were not the "business of insurance." Id. at 483-84. The court recognized that the insurers had already made the underwriting decision to cover these mental and nervous disorders in their policies. "Their decision regarding psychologists was not whether to underwrite the risk of those disorders or even the need for psychotherapy; rather it was a question of who (sic) they would pay for such services." Id. at 484. The court therefore decided that the defendants' actions did not fall within the traditional meaning of the "business of insurance" but rather related to the cost of carrying out their contractual obligation. Other cases since Royal Drug support the interpretation that only the core activities of a traditional insurance company, viz., the underwriting and risk spreading functions, fall within the McCarran-Ferguson Act exemption for the business of insurance.[2]
 
 
 11
 3) Refusal to Cover Podiatrists and the "Business of Insurance"
 
 
 12
 Relying on the facts that podiatrists are prohibited by statute from providing certain services that M.D.'s may provide and that the Oregon legislature has not enacted an "equality of insurance" statute for podiatrists, the district court concluded that the exclusion of podiatrist services is an integral part of the risk of covering care to the foot. 508 F.Supp. at 974-75. The record does not support this conclusion.
 
 
 13
 The defendants have introduced no evidence tending to establish that there are any bona fide risk-related reasons for an insurer to distinguish between the services of M.D.'s and podiatrists, much less that such a distinction is at the core of what is commonly understood to be the "business of insurance." One may doubt whether the insurance provision legitimately relates to the underwriting or spreading of risk by an insurer. Of particular importance to the case here, "it is plain that the challenged ... practices are not limited to entities within the insurance industry." Pireno, --- U.S. at ----, 102 S.Ct. at 3010, 73 L.Ed.2d 647. As the Supreme Court noted in that case, the McCarran-Ferguson exemption "was intended primarily to protect 'intra -industry competition' in the underwriting of risks.... Arrangements between insurance companies and parties outside the insurance industry can hardly be said to lie at the center of that legislative concern. More importantly, such arrangements may prove contrary to the spirit as well as the letter of (the exemption) because they have the potential to restrain competition in non-insurance markets. The peer review practices challenged in the present case assertedly realize precisely this potential: Respondent's claim is that the practices restrain competition in a provider market-the market for chiropractic services-rather than in an insurance market." Id. Although the Supreme Court did not hold that effect on non-insurance markets was in itself sufficient to negate the applicability of the McCarran-Ferguson exemption, arrangements whose primary impact is on competition in markets other than that for insurance do not fall within the exemption. Since this is the case here, the appellees cannot claim the benefit of the McCarran-Ferguson exemption.
 
 
 14
 The ruling of the district court, allowing the McCarran-Ferguson exemption as a defense, is reversed.
 
 B. Interstate Commerce
 
 15
 The district court also found that the plaintiffs had failed to meet the interstate commerce jurisdictional requirement of the Sherman Act. We disagree.
 
 
 16
 Jurisdiction under the Sherman Act extends not only to activities actually in interstate commerce, but also to activities wholly local in nature that substantially affect interstate commerce. McLain v. Real Estate Bd., Inc., 444 U.S. 232, 237, 241, 100 S.Ct. 502, 506, 508, 62 L.Ed.2d 441 (1980). McLain sets forth a two-part analysis for determining if the commerce requirement was satisfied.
 
 
 17
 First, a relevant aspect of interstate commerce must be identified. Second, the defendants' activities must be shown " 'as a matter of practical economics' to have a not insubstantial effect on the interstate commerce involved."
 
 
 18
 Palmer v. Roosevelt Lake Log Owners Ass'n, Inc., 651 F.2d 1289, 1291 (9th Cir. 1981).
 
 
 19
 In McLain real estate purchasers and sellers alleged a conspiracy by real estate brokers to fix real estate commissions. The McLain Court began its analysis by stating that, to establish subject matter jurisdiction, it is sufficient to demonstrate that defendants' relevant activities have a "not insubstantial effect" on interstate commerce. 444 U.S. at 242, 246, 100 S.Ct. at 509, 511. At the jurisdictional stage plaintiffs need not make a more particularized showing that the allegedly unlawful restraint (in McLain, the alleged price fixing scheme) itself affects interstate commerce. Id. at 242, 100 S.Ct. at 509. The Court emphasized that more was not required. "If establishing jurisdiction required a showing that the unlawful conduct itself had an effect on interstate commerce, jurisdiction would be defeated by a demonstration that the alleged restraint failed to have its intended anticompetitive effect." Id. at 243, 100 S.Ct. at 509.
 
 
 20
 The district court misapplied the McLain analysis. First, the district court did not identify the relevant line of commerce. More importantly, the district court focused its inquiry exclusively on the nature and extent of plaintiffs' interstate contacts, concluding that, because plaintiffs' interstate activities are insubstantial, defendants' activities could not substantially affect them. Hahn v. Oregon Physicians Service, 508 F.Supp. 970, 977 (D.Or.1981).
 
 
 21
 The plaintiffs' interstate contacts are relevant because the jurisdictional requirement may be satisfied by showing that defendants' activities affect interstate commerce through their effect on plaintiffs' interstate activities. See, e.g., Hospital Building Co. v. Trustees of Rex Hospital, 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). However, if the plaintiffs' interstate contacts are insubstantial, jurisdiction may also be established directly by the defendants' activities. The trial court must conduct a broader inquiry into the defendants' activities to ascertain whether they themselves affect interstate commerce. We thus remand for identification of a relevant aspect of interstate commerce and a determination whether defendants' relevant insurance activities, taking into account their overall effect on interstate commerce and not simply their effect on the particular plaintiffs before the court, have, as a matter of practical economics, a "not insubstantial effect" on interstate commerce.
 
 
 22
 REVERSED and REMANDED.
 
 
 
 [1]
 The Court rejected the argument that the contested activity so closely effected Blue Shield's reliability so as to constitute the "business of insurance." The court stated:
 (E)very business decision made by an insurance company has some impact on its reliability, its ratemaking, and its status as a reliable insurer.... If terms such as "reliability" and "status as a reliable insurer" were to be interpreted in the broad sense urged by the petitioners, almost every business decision of an insurance company could be included in the "business of insurance." Such a result would be plainly contrary to the statutory language, which exempts the "business of insurance" and not the "business of insurance companies."
 Royal Drug, 440 U.S. at 216-17, 99 S.Ct. at 1075-76.
 
 
 [2]
 We note that other courts have recognized that certain health-care provider organizations may not fall within the McCarran-Ferguson Act's definition of the "business of insurance." The Supreme Court stated in Royal Drug that at the time of the enactment of the McCarran-Ferguson Act, organizations which were organized to provide their members with health care and hospitalization services were not considered to be engaged in the insurance business. 440 U.S. at 225-30 & n.33, 99 S.Ct. at 1080-82 & n.33. The Court, however, found it unnecessary to decide this issue. Id. See also Virginia Academy of Clinical Psychologists v. Blue Shield of Virginia, 624 F.2d 476, 483 (4th Cir. 1980), cert. denied, 450 U.S. 916, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981) (exemption should be narrowly applied to Blue Shield plans, especially where provider control is at issue)
 Prepaid health care provider plans are difficult to analyze because they go beyond the normal insurance function of insuring against specific casualty losses, and may also provide routine health care services. Courts should be careful not to allow insurance companies to broaden the antitrust exemption by simply diversifying into areas not traditionally considered to be the business of insurance.