Robert B. LITMAN, M.D., Plaintiff,

v.

A. BARTON HEPBURN HOSPITAL, Bernard Musselman, M.D., Michael Severson, M.D. and John W. Symons, Defendants.

No. 81–CV–234.

United States District Court,
N.D. New York.

Feb. 23, 1988.

Litman Law Offices, Arlington, Va. (Richard C. Litman, Donald S. Litman, of counsel), Lekki & Crowe, Canton, N.Y., for plaintiff.

Garfunkel, Wild & Travers, P.C., A. Barton Hepburn Hosp., and John W. Symons, Great Neck, N.Y. (Leonard M. Rosenberg, Norton L. Travis, of counsel), Martin, Ganotis & Brown, P.C., Bernard Musselman, M.D. and Michael Severson, M.D., Syracuse, N.Y. (James Ganotis, of counsel), for defendants.

## MEMORANDUM–DECISION & ORDER

### MUNSON, Chief Judge.

Pending before the court are several motions brought by the various parties over the course of this drawn out litigation. Defendants A. Barton Hepburn Hospital and John W. Symons ("the Hospital defendants") and plaintiff brought cross-motions in September of 1985 seeking sanctions and costs associated with discovery disputes dating back almost to the commencement of this action. Plaintiff also has outstanding a motion in which he seeks an order compelling production of documents related to the extent and source of the revenues of defendants Bernard Musselman, M.D. and Michael Severson, M.D. That motion was originally filed on August 22, 1986 but was not argued until July 17, 1987.

On that same date the court also heard argument on a motion to dismiss brought by defendants Musselman and Severson pursuant to Rules 12(b)(1), 12(b)(6) and 56 of the Federal Rules of Civil Procedure. Argument on a similarly styled motion brought by the Hospital defendants was heard on January 25, 1988. Both sets of defendants contest, *inter alia*, the court's jurisdiction under the Sherman Anti–Trust Act, 15 U.S.C. § 1, *et seq.*, and the sufficiency and significance of plaintiff's allegations concerning the defendants' alleged conspiracy to preclude competition from plaintiff in the field of pediatrics. The court will, necessarily, consider the jurisdiction arguments first.

## SHERMAN ANTITRUST JURISDICTION

### BACKGROUND

Plaintiff commenced this action by filing a complaint on March 13, 1981. On November 28, 1983 an amended complaint was filed. Within the amended complaint were five discernible causes of action—one brought under the Sherman Act, a second citing New York State's analogous anti-trust provision, the Donnelly Act, a third brought under common law theories of unfair competition and restraint of trade, a fourth claiming breach of contract and a fifth alleging violation of 42 U.S.C. § 1983. At this juncture, following various motions to dismiss, the only remaining claim is that brought under the Sherman Act.

Plaintiff centers his Sherman Act allegations on establishing that the defendants conspired to reduce or eliminate him as a competitive force in the field of pediatrics in the Ogdensburg, New York area. He asserts that they accomplished this through implementation, in April of 1979, of a new regulation which provided that clinical privileges in pediatrics at A. Barton Hepburn Hospital ("Hepburn Hospital" or "the hospital") could only be granted upon

successful completion of a three month, post graduate residency in pediatrics. Clinical privileges play an essential role in a physician's practice because they permit the physician to admit and treat patients at a hospital. Without such privileges in pediatrics at Hepburn Hospital, argues plaintiff, he is unable to fully treat from "cradle to grave" those patients he sees in his private practice.

It does not appear that plaintiff objects to the hospital's efforts to ensure the quality of care rendered to patients through its implementation of minimum training requirements, but rather, that he objects to what he perceives as the hospital's sudden and calculated efforts to impose and enforce the three month requirement in April of 1979. Plaintiff was recruited from a practice in New Haven, Connecticut in May of 1977 by a search agency located in New York City. During June and July of that year plaintiff had several discussions with hospital personnel, including the hospital's Executive Vice President–Administrator, defendant John W. Symons, concerning the privileges plaintiff would be granted were he to accept the hospital's offer of employment. Apparently assured that he would receive the full range of privileges needed to supplement the private practice he sought to develop, Dr. Litman submitted his formal application for admission to the hospital's staff. That application, dated July 29, 1977, contained a request for clinical privileges in pediatrics, medicine, obstetrics and gynecology, minor surgery, family practice and emergency medicine. On August 15, 1977 the Board of Directors at the hospital approved Dr. Litman's request for admission to the hospital's medical staff. That decision did not confer any clinical privileges upon Dr. Litman. On August 23, 1977 the Executive Committee of the medical staff granted to Dr. Litman clinical privileges in what the committee denominated as "family practice." The parties are in disagreement as to the significance of that grant of privileges. According to defendants, as noted in their uncontradicted 10J statement, the grant of family practice privileges did not confer upon Dr. Litman privileges in pediatrics. Plain-

tiff counters that the intent of the hospital was to grant him privileges in each of the areas he had requested, including pediatrics. This he says is borne out through testimony of certain hospital personnel, including Doctor Hugh Inness–Brown, Chairman of the Executive Committee of the medical staff, and through the uncontroverted fact that from August of 1977 through April or May of 1979, Dr. Litman admitted and treated pediatric patients at the A. Hepburn Hospital as would any other physician who possessed pediatric privileges. Thus, as noted above, Dr. Litman does not appear to object in principle to requiring of physicians that they undertake minimal training as a prerequisite to gaining privileges, but rather he objects to being compelled to undertake a three month training period after he had accumulated some twenty months of practice at the hospital during which he apparently enjoyed pediatric privileges without protest from hospital personnel. Dr. Litman asserts that the training requirement was specifically instituted to restrict and perhaps destroy his pediatric and general practice.

The parties contest whether the three month training requirement was in fact "new" in April of 1979. Defendants claim that as early as a December 18, 1974 meeting the hospital's medical staff "decided upon" a six month post graduate training period as a prerequisite to gaining clinical pediatric privileges. It cannot be discerned from the minutes of that meeting whether the six month requirement was actually binding, and it does not appear that the requirement was ever incorporated into the hospital's by-laws.

At a meeting held on April 11, 1978 the medical staff established a family practice subspecialty within the hospital's Department of Medicine. On April 3, 1979 the medical staff again met and discussion ensued concerning the issue of granting clinical privileges to family practitioners in departments other than the Department of Medicine. This issue was pressing because there were, and remain, five departments at the hospital other than the Department of Medicine. Thus family practitioners,

whose practice is directed at a broad range of patients and therefore likely to benefit from privileges in each of the departments, needed to know what requirements had to be met to gain additional privileges. At the April 3, 1979 meeting it was decided that each department would retain control over the training requirements for its department. Doctor Musselman, Chairman of the Department of Pediatrics, proposed that a six month training requirement be established for his department. It is unclear why such a proposal was necessary if, as alleged by defendants, a six month requirement had been adopted in December of 1974. Nonetheless, the six month requirement was rejected in lieu of a three month training period. That three month requirement was not formally adopted into the hospital's by-laws until November 19, 1979. As adopted, the three month requirement reflected a concession to Dr. Litman in that he was granted a special opportunity to undertake just two weeks of neonatal training in order to gain privileges for treating newborns.

It is evident that the concession to Dr. Litman was motivated by events which transpired in the roughly eight month period between the April discussions of requirements for clinical privileges and the November adoption of the new by-law. Plaintiff alleges that on May 13, 1979 he met with a patient whose child he had delivered the night before. The patient indicated to Dr. Litman that Dr. Severson had come to her room and indicated to her that Dr. Litman could not treat her newborn son. Apparently, Dr. Severson was acting on the fact that Dr. Litman did not have pediatric privileges. This assumption is suggested by events which followed thereafter. On June 14, 1979 Dr. Litman wrote to Robert Hentschel, M.D., President of the medical staff, requesting clarification of plaintiff's privileges concerning the care of infants he had delivered. By letter dated July 9, 1979 Dr. Litman was told he would have to abide by the restrictions placed upon his practice at least until the next meeting of the medical staff. On October 2, 1979 the medical staff met and discussed Dr. Litman's situation. An ad

hoc committee was appointed; it was the committee's recommendations which led to the compromise plan ultimately adopted into the hospital's by-laws on November 19, 1979.

Despite the adoption of the compromise plan the situation worsened. On March 11, 1980 Symons wrote to Dr. Litman advising him that he faced summary suspension if he did not relinquish to a doctor with clinical pediatric privileges a pediatric patient he had admitted. There were other disputes between Dr. Litman and certain members of the medical staff in March. In November of 1980 Dr. Litman undertook what he believed was the requisite two week training necessary to gain neo-natal privileges. Doctor Litman presented his credentials at a meeting of the medical staff on December 2, 1980 but was denied neo-natal privileges, apparently because a majority of the board believed that the adopted by-law required Dr. Litman to acquire the two week neo-natal training in conjunction with an additional ten weeks of pediatric training. However, at a special meeting held on December 8, 1980 Dr. Litman was granted neo-natal privileges. He did not gain pediatric privileges. On March 13, 1981 plaintiff commenced this action.

## DISCUSSION

Under the Sherman Act, a federal district court's jurisdiction can be established through a showing that the defendant's conduct "is 'within' the stream of interstate commerce," *Furlong v. Long Island College Hospital,* 710 F.2d 922, 925 (2d Cir. 1983) (citing *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975)), or that the defendant's conduct, "although entirely local or confined to one state, nonetheless 'affects' interstate commerce." *Furlong,* 710 F.2d at 925 (citing *United States v. Employing Plasterers Association,* 347 U.S. 186, 74 S.Ct. 452, 98 L.Ed. 618 (1954)). While plaintiff makes a halfhearted attempt at arguing that the defendants' activities are within interstate commerce due to the hospital's location near a major international waterway and a bridge spanning that waterway, it is evi-

dent that plaintiff understands that mere proximity to potential patients from places other than New York State does not in and of itself place the hospital's activities, much less the challenged conduct, within interstate commerce. Thus it is incumbent upon plaintiff to establish that the challenged conduct affects interstate commerce.

Seminal in the line of cases outlining a plaintiff's burden under the effecting commerce test is *McLain v. Real Estate Board of New Orleans*, 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980). In *McLain* the United States Supreme Court held as sufficient to withstand a motion to dismiss the jurisdictional allegations of a group of real estate purchasers and sellers against a group of New Orleans real estate brokers who were said to be conspiring to fix commission rates. *Id.* at 246–47, 100 S.Ct. at 511. In arriving at this determination the Court used language which has spawned two lines of cases, the first more likely than the second to sustain a plaintiff's jurisdictional allegations.

Representative of the first line of cases is *Western Waste Service Systems v. Universal Waste Control*, 616 F.2d 1094 (9th Cir.), *cert. denied*, 449 U.S. 869, 101 S.Ct. 205, 66 L.Ed.2d 88 (1980). There the 9th Circuit Court of Appeals read the *McLain* decision only to require from plaintiff a showing that the defendant's business activities themselves had a substantial effect on interstate commerce. *Id.* at 1097. The court rejected the argument that plaintiff should be required to show a nexus between the defendant's alleged illegal activity and an effect on interstate commerce. *Id.; See, Hahn v. Oregon Physicians Service*, 689 F.2d 840, 844 (9th Cir.1982), *cert. denied*, 462 U.S. 1133, 103 S.Ct. 3115, 77 L.Ed.2d 1369 (1983); *McElhinney v. Medical Protective Co.*, 549 F.Supp. 121, 127–28 (E.D.Ky.1982), *remanded without opinion*, 738 F.2d 439 (6th Cir.1984).

The Second Circuit's *Furlong* decision, as well as decisions of the First, Seventh, Eighth and Tenth Circuits, reject the more lenient approach adopted by the Ninth Circuit. *Seglin v. Esau*, 769 F.2d 1274, 1280 (7th Cir.1985); *Hayden v. Bracy*, 744 F.2d 1338, 1342–43 (8th Cir.1984); *Cordova & Simonpietri Insurance Agency v. Chase Manhattan Bank*, 649 F.2d 36, 45 (1st Cir.1981); *Crane v. Intermountain Health Care, Inc.*, 637 F.2d 715, 719, 722 (10th Cir.1981). As the *Furlong* court concluded:

> We agree with the First and Tenth Circuits that it would not be prudent to extract from *McLain* a generalized rule that antitrust jurisdiction can be established simply by showing that some aspects of a defendant's business have a relationship to interstate commerce. Rather the inquiry must be whether the defendant's activity that has allegedly been "infected" by unlawful conduct can be shown " 'as a matter of practical economics' to have a not insubstantial effect on the interstate commerce involved." *McLain*, 444 U.S. at 246 [100 S.Ct. at 511] (quoting *Hospital Building Co. v. Rex Hospital Trustees*, 425 U.S. 738, 745 [96 S.Ct. 1848, 1852, 48 L.Ed.2d 338] (1976)).

*Furlong*, 710 F.2d at 926. This court's inquiry into the plaintiff's jurisdictional allegations will comport with the Second Circuit's interpretation of *McLain*.

That inquiry, though ultimately less permissive than that undertaken in the Ninth Circuit, is broadened somewhat by the *Furlong* court's determination that the effect on interstate commerce can be measured by the plaintiff's activities as well as those of the defendant. The lower court had apparently concluded that a hospital's denial of clinical privileges to a physician could not affect the hospital's activities in interstate commerce, thereby limiting the "affecting commerce" inquiry to the effect of the illegal activity on the physician. The Second Circuit rejected this rigid approach by noting that a denial of privileges had the potential to affect the defendant hospital's use and purchase of goods and services, some or all of which might derive from interstate commerce. Thus this court will look to the activities of the various defendants as well as those of plaintiff.

Numerous courts have examined the effect on interstate commerce of a decision to withhold clinical privileges from a physician. These courts tend to identify similar facets of a physician's practice and the administration of a hospital which, if affected by a decision to withhold privileges, may in turn have a "not insubstantial" effect upon interstate commerce. In *Furlong* the court considered the implications of such a decision on the purchase of supplies and services from out-of-state, the receipt of insurance payments from out-of-state companies and the receipt of federal subsidies. *Furlong,* 710 F.2d at 924, 927. The Eighth Circuit has discussed the effect on prices charged to out-of-state patients, and impliedly, on the supply of patients from out-of-state. *Hayden,* 744 F.2d at 1342–43. Finally, at least one court has considered the effect on interstate recruitment of physicians of a medical college's implementation of a fee setting plan for salaried faculty members. *Tarleton v. Meharry Medical College,* 717 F.2d 1523, 1531–32 (6th Cir.1983).

Before considering plaintiff's jurisdictional allegations, it should be observed that the pending motions to dismiss, though brought pursuant to Rules 12 and 56, will be construed as motions for summary judgment since the court looked to the voluminous supporting documents submitted by the parties. As such, plaintiff can not benefit from the traditional standard for a Rule 12 motion that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). Nor can plaintiff as readily benefit from the admonition that "in antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' . . . dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Rex*

*Hospital Trustees,* 425 U.S. at 746, 96 S.Ct. at 1853 (quoting *Poller v. Columbia Broadcasting,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962)). This is so both because discovery is complete except for the outstanding discovery motion against Drs. Musselman and Severson which, at best, could only produce facts marginally related to the issue of the court's jurisdiction,[1] and because any evidence of the conspiracy's effect on Dr. Litman's interstate commerce activities is within his control. Ultimately, plaintiff must convince the court that there exist material issues of fact concerning his jurisdictional allegations that, if resolved in his favor, would warrant the court's retaining jurisdiction. Plaintiff faces an uphill battle.

■ Plaintiff has failed to show how the three month training requirement affects the hospital's interstate activities. Plaintiff states that the hospital receives large volumes of supplies and equipment, Medicaire, Medicaid and other federal subsidies, insurance reimbursements and patients from out-of-state. These facts are not disputed; however, without more they are meaningless. Plaintiff does not indicate how the hospital's decision not to grant him clinical privileges in pediatrics in any way affects any or all of these interstate activities. This failure is not surprising. Any individual of pediatric age whose symptoms necessitate admission to the hospital will be admitted regardless of whether Dr. Litman admits them; this will be so of the occasional out-of-state patient admitted to the hospital and of Dr. Litman's own pediatric age patients. Moreover it is not argued, nor can it reasonably be assumed, that any pediatric patient admitted to the hospital will not accept continued treatment there simply because Dr. Litman is unavailable. Thus, even if, as Dr. Litman argues, 4% of the hospital's patients come from out-of-state, there is no reason to believe that that percentage would change due to the denial

---

1. In line with the court's analysis below of plaintiff's jurisdiction arguments, it appears that any effect the denial of privileges might have upon the interstate commerce aspects of the

business of Drs. Musselman and Severson would, at most, be *de minimus.* Therefore the court denies plaintiff's motion of August 22, 1986.

of clinical privileges. Given the conclusion that the hospital's population of pediatric patients will not change either in number or in geographic composition due to the denial of privileges, the court must also conclude that the alleged conspiracy will not affect the hospital's receipt of supplies, subsidies or insurance payments from interstate commerce.

■ In the absence of facts establishing an effect on the hospital's interstate activities, the court's jurisdiction can only rest on facts establishing that the denial of privileges had a "not insubstantial" effect on Dr. Litman's interstate activities. As noted earlier, whatever evidence there may be to establish this effect is within Dr. Litman's control. Towards this end, Dr. Litman states that "[b]efore the [d]efendants' conspiracy went into effect" he received insurance payments, federal subsidies and supplies for his clinical pediatric practice from interstate commerce. He also states that in the roughly twenty month period prior to the conspiracy he treated some 174 clinical pediatric patients. Yet Dr. Litman is unable to state whether any of those 174 patients were from out-of-state, though he believes it "reasonable to assume that several" were. Dr. Litman makes that assumption because he is certain that he has treated out-of-state patients, some of whom he has identified, and

because Ogdensburg is located near sources of out-of-state patients.

What Dr. Litman fails to do is state what in fact has happened since the alleged conspiracy went into effect. While he undoubtedly does not currently treat pediatric patients clinically, he has not stated that he no longer treats his original 174 pediatric patients or that he has not gained new pediatric patients in his private practice.[2] Moreover, while he states that before the conspiracy he received supplies, subsidies and insurance payments from out-of-state, he does not indicate whether the amounts he receives of any of these has decreased following the conspiracy, much less as a result of the conspiracy. The court does not expect mathematical precision, such would be extremely difficult to calculate; however, it does expect something from plaintiff other than bare statements that before the conspiracy he received these items from out-of-state. The court will not, on a motion for summary judgement, make for plaintiff the assumption those bare statements invite—that after the conspiracy those out-of-state sources have lessened or ceased.

Plaintiff maintains an ongoing private practice in Ogdensburg. He also retains clinical privileges at A. Barton Hepburn Hospital in family practice, obstetrics, medicine, minor surgery and newborn pediatrics.[3] At most, the denial of privileges has

2. Plaintiff argues that he "has been completely unable to provide clinical pediatric care to the children of Ogdensburg" since the advent of the conspiracy. As a result, he argues, the 174 children he treated prior to the conspiracy have been "forced to enter into 'transactions' with other physicians that they would not otherwise have had to involve themselves in." It is clear that plaintiff stops short of saying that which would most help his jurisdictional argument—that these patients no longer utilize his private practice. There is a great likelihood that the majority of these 174 patients have not required further hospital care and that the majority of his other pediatric patients have not required hospital care. Thus, without a contrary assertion from plaintiff, the court is forced to conclude that many of these patients continue as Dr. Litman's patients and that he continues to gain new pediatric patients even though he may not be fully competitive.

3. Plaintiff argues that the defendants' conspiracy to revoke his privileges "will adversely ef-

fect his practice in other specialties." While there may be some loss of business in other specialties, plaintiff has not indicated whether in fact this has occurred. Moreover, plaintiff has had ample opportunity over the last eight years to gain the training necessary to gain pediatric privileges. Defendants have merely instituted a requirement which would require plaintiff to gain a total of three months pediatric training over whatever time period would be most convenient for plaintiff. Under the Rule of Reason analysis applicable here, the hospital's training requirement appears both to be motivated by appropriate concerns for the maintenance of standards at the hospital and not to create an unreasonable restraint on trade. It would not, therefore, be appropriate for the court to charge defendants with the responsibility for all of the business plaintiff may have lost over the past eight years, nor for the related effect that loss may have had on interstate commerce.

lessened by some undeterminable amount the number of pediatric patients plaintiff treats. That diminished number might, in turn, result in some decrease in plaintiff's receipt of supplies and funds from out-of-state. But the extent of that decrease has only been alluded to by plaintiff. It is the conclusion of the court that any effect could only be of a *de minimus* nature. *Sarin v. Samaritan Health Center*, 813 F.2d 755, 758 (6th Cir.1987); *Hayden*, 744 F.2d at 1343; *see Mamakos v. Huntington Hospital*, 653 F.Supp. 1447, 1451–52 (E.D. N.Y.1987). As such, the effect could not be characterized as the "not insubstantial" effect needed to establish this court's jurisdiction under the Sherman Act.[4]

# DISCOVERY SANCTIONS

## DISCUSSION

█ The pending motions for sanctions, costs and expenses center upon two series of events—those surrounding the court's December 31, 1981 grant of plaintiff's *ex parte* application for a discovery order and those concerning attempts either to comply with or circumvent the court's April 1, 1985 Order which set an August 1, 1985 deadline for the completion of discovery.

On December 31, 1981 the court received, and granted, plaintiff's request for an order compelling defendants to appear for depositions and ordering those same defendants to recompense plaintiff for costs associated with their failure to appear at earlier depositions. The court granted this *ex parte* request based upon representations made by plaintiff's attorney, Richard C. Litman.[5] These representations were, if not quite outright lies, deceptive to a point that compels disciplinary action.

At the time of plaintiff's application for the December 31, 1981 Order, Local Rule 46 permitted such an application to be made *ex parte* if "no opposition or objection (was) timely made" to the discovery procedure sought to be compelled. Attorney Litman, in his sworn affidavit accompanying the application, twice stated that no opposition or objection to depositions noticed for November 30, 1981 had been "properly interposed" by the defendants. While no formal objection in the form of a motion seeking a protective order or other remedy was filed, it is abundantly clear from the affidavits and documents filed in support of the pending motions[6] that the

4. Plaintiff cites the fact that he was recruited through interstate commerce as a further ground for the court's jurisdiction. He refers to the *Tarleton* decision's consideration of the fact that the Meharry Medical College's implementation of a price fixing program would restrict the recruitment of out-of-state physicians. Meharry is a medical school and affiliated hospital which actively recruits physicians from around the country and around the world. Hepburn Hospital's training requirement might effect recruitment of out-of-state doctors to some degree, but it is not known to the court whether the hospital actually continues out-of-state recruitment, nor whether any significant number of new physicians are hired for the pediatric department at the hospital. Residency requirements as a prerequisite to clinical privileges are a fact of life for physicians; a physician deciding whether to practice at a particular hospital would presumably place much greater importance on the availability of patients, the locale and the hospital's facilities rather then on the hospital's training requirements. Moreover, since the three month training period does not appear excessive, it is probably similar to requirements in other states and thus any qualified out-of-state doctor would not be hindered by the hospital's requirement while it could only speciously be argued that a doctor without the requisite three

month training was precluded from participation in interstate commerce solely by virtue of Hepburn Hospital's requirement.

5. Plaintiff is represented by his brother.

6. The motions currently being considered were brought in September of 1985. These motions will be referred to by the date on which they were signed since they were not filed in chronological order. In response to a July 31, 1985 motion by plaintiff which sought a protective order from interrogatories propounded by the hospital and Symons, these defendants moved on September 5, 1985 for an order denying the protective order and awarding costs and attorneys' fees. The court denied the protective order and reserved on the application for costs and attorneys fees. On September 5, 1985 plaintiff moved for an order enforcing the terms of the court's December 31, 1981 Order, and more specifically, to recover the costs the court had ordered paid by defendants to recompense plaintiff for the costs he had incurred when the defendants failed to attend their November 1981 depositions.

The subject of deposing these defendants apparently did not arise again until 1985. In July of that year the parties again failed to conduct

defendants made known to plaintiff their opposition to the depositions. According to the affidavit of Norton L. Travis, attorney for the Hospital defendants, on November 4, 1981 he had a discussion with attorney Litman in which it was allegedly agreed that all discovery would be held in abeyance until the disposition of motions to dismiss which defendants intended to file. On November 10, 1981 local counsel for plaintiff noticed depositions of the defendants for November 30, 1981. On November 16, 1981 Travis wrote to plaintiff's local counsel objecting to the noticing of depositions of his clients. James Ganotis, counsel for defendants Musselman and Severson, wrote a similar letter on November 19, 1981. Each letter indicated that its author had spoken with attorney Litman prior to the noticing of the depositions and had understood that discovery was not to continue. Moreover, as evidenced by a November 24, 1981 letter from attorney Litman in which he stated that discovery would not be held in abeyance, it is clear that attorney Litman knew of the defendants' objections.

Attorney Litman states in his opposition to the imposition of sanctions that he never agreed to suspend discovery, although he acknowledges that the request was made. He argues that the proper means for objecting would have been by motion, something which was not done. These facts, coupled with his claim that "(c)opies of the (November 16, 19 and 24) letters between

counsel referred to in Mr. Travis' affidavit were sent to the Court and presumably were available to Judge Munson at the time he entered the order," led attorney Litman to conclude that "(t)here was no deception involved in obtaining the December 31, 1981 order." The court does not reach the same conclusion. First, the court only received the November 24 letter by attorney Litman, and did so a full month before the *ex parte* application, independent of any motion which might have called the letter to the court's attention. Thus attorney Litman misrepresents, even when faced with the imposition of sanctions, the extent to which he produced documents to the court.[7] Second, attorney Litman stated that no opposition to the November 30, 1981 depositions had been "properly interposed." As the court interprets plaintiff's argument, counsel is resting his defense to sanctions on the fact that he inserted the word "properly" in the *ex parte* application and on his definition of properly as meaning by a motion. Such fine distinctions are appropriate for scholarly legal arguments, they have no place in a sworn attorney's statement of facts designed to gain supposedly deserved relief from a court. This is particularly so when the attorney enjoys the obvious tactical advantage of knowing that his version of the facts will be uncontroverted. Stated simply, there were objections to the November 30, 1981 depositions; attorney Litman had the opportunity to append all of the letters between counsel

the contested depositions; they did succeed, however, in raising the level of rancor one notch higher. This is reflected in plaintiff's September 5 motion which also seeks costs for the defendants' failure to attend depositions which had been noticed for July 15, 1985. Given the fact that plaintiff had not previously sought enforcement of the December 31, 1981 *ex parte* Order, defendants did not learn of that Order until they received plaintiff's September 5 motion. In response, defendants moved on September 11, 1985 for an order vacating the December 31, 1981 Order and for sanctions pursuant to Rules 11 and 37(a)(4), citing plaintiff's allegedly fraudulent representation that no objection or opposition had been made to the November 1981 depositions. On September 12 plaintiff filed papers opposing the sanctions motion and seeking, again, enforcement of the December 31, 1981 Order. On September 17 the court vacated its December 31, 1981 Order, but

reserved on the motion for sanctions. The court also reserved on plaintiff's motion for costs associated with the defendants' alleged failure to attend the July 15 motions.

Thus, still pending is defendants' September 5 motion for costs associated with opposing plaintiff's request for a protective order, plaintiff's September 5 motion for costs related to the July 15 motions and defendants' September 11 motion for sanctions concerning the December 31, 1981 Order.

7. The court construes attorney Litman's statement that copies of all the letters were sent to the court to be an attempt to imply that he sent them since the attorney could not have understood it to be the case that attorneys Travis and Ganotis had sent copies of their letters when in fact they had not done so.

to his application, and he had the obligation to this court and his adversary to fully apprise the court of the facts bearing upon his application. He did not do so.

The court need not belabor the evolution of Rule 11 sanctions. As the rule read in pertinent part in 1981, "(t)he signature of an attorney [on a pleading or a motion][8] constitutes a certificate by him that he has read the pleading, that to the best of his knowledge, information and belief there is good ground to support it. . . ." The imposition of a Rule 11 sanction was then predicated on a finding that the attorney acted in bad faith, but the court could only inquire into the attorney's subjective belief at the time the offending paper was signed. *Eastway Construction Corporation v. City of New York,* 762 F.2d 243, 253 (2d Cir.1985) (citing *Nemeroff v. Abelson,* 620 F.2d 339, 348 (2d Cir.1980). It is the court's conclusion that attorney Litman acted in bad faith, and did so knowingly, with the intent of improperly gaining an order his client would not otherwise have been entitled to. The court therefore will impose sanctions pursuant to Rule 11. Those sanctions will be in the amount of $1,500 and shall be paid by attorney Litman within twenty days of this Memorandum—Decision and Order to the hospital defendants to offset the costs of defending against this lawsuit.[9]

■ Still to be resolved are the motions of September 5, 1985 in which plaintiff seeks costs associated with the alleged failure of defendants to attend depositions noticed for July 15, 1985 and in which the hospital defendants seek costs for opposing the plaintiff's application for a protective order concerning interrogatories propounded by the defendants. The relevant facts are as follows. On April 1, 1985 the court ordered all discovery completed by August 1, 1985. On July 3, 1985 plaintiff prepared notices of depositions for service upon defendants; these notices were received by defendants' counsel on July 8. The depositions were to be held on July 15–17, 1985.[10] Upon receipt of the notices, Travis telephoned attorney Litman in an attempt to arrange a different date. A letter dated July 8, 1985 from Travis to attorney Litman indicated that Travis had long standing obligations on July 15 and 17 and that Symons was unavailable on July 15. Travis proposed several alternative dates, including some beyond the July 31 discovery deadline and for which a stipulation extending the completion of discovery was offered. Agreement was not reached, and thus plaintiff felt compelled to apply *ex parte* for an additional 45 days in which "to complete his discovery." In his application attorney Litman represented that defendants did not oppose granting such an extension of time to plaintiff. The application was granted.

Coincidentally on July 3, 1985 the Hospital defendants had propounded interrogatories on plaintiff. Plaintiff sought, in papers dated July 27, 1985, a protective order that he need not answer the interrogatories. Plaintiff did not object to the content of the interrogatories. Instead, he argued that they were untimely in that his client's thirty day period in which to answer would extend several days beyond the July 31, 1985 discovery deadline. Plaintiff argued that defendants should, apparently as some form of punishment, be precluded from gaining this form of discovery because "they waited until the eleventh hour (July 3, 1985) in which to propound interrogatories. . . ." The court did not accept this

---

8. As observed by the Advisory Committee on Rules when Rule 11 was amended in 1983, the former Rule 11 "always applied to motions and other papers by virtue of incorporation by reference in Rule 7(b)(2)."

9. Through this sanction the court also compensates defendants for the costs of gaining the September 16, 1985 Order of this court which vacated the December 31, 1981 Order.

10. The depositions were held in early September of 1985. They lasted a total of three hours. The court questions why plaintiff's counsel noticed three days of depositions, when, after four years of anticipating these depositions, he most certainly should have had a reasonable estimation of their length. While the court will not ascribe bad faith to attorney Litman's miscalculation, it also will not ignore this factor when evaluating plaintiff's September 5 request for costs.

argument, nor did it find anything objectionable in the interrogatories themselves and therefore denied the motion for a protective order. The Hospital defendants' related September 5 motion, for costs and attorneys fees necessary to defend against the protective order, will now be resolved.

The court considers plaintiff's "eleventh hour" argument to be rather incredible. On the same date that defendants propounded the contested interrogatories plaintiff noticed the depositions of the defendants and sought the production of documents. Once again, an overly technical argument does not excuse the behavior of attorney Litman. Counsel appears to argue, or at least to believe, that because depositions need not be noticed well in advance, the July 3 notices were timely while the July 3 interrogatories, with their outside 30 day limit, were untimely. While technically correct as to statutory periods of time, attorney Litman's actions evidence a disregard for the spirit of cooperation sought to be engendered under rules of discovery as well as for the court's role in resolving discovery disputes. Certainly attorney Litman was aware, through receipt of Travis' July 8 letter that an extension of time in which to answer the interrogatories could have been gained. Counsel was also well aware, after four years of litigation before this court, of this court's flexibility with deadlines. More significantly, the court finds the claim that defendants had agreed to a 45 day extension in which plaintiff could complete discovery without gaining a reciprocal agreement concerning their interrogatories to have been unfounded.

The court recognized the motion lacked merit when it denied the protective order application in September of 1985; it now recognizes the unnecessary burden placed upon defendants by the defense of that motion through the imposition of costs and attorneys' fees in the amount of $1,000 pursuant to Rule 37(a)(4). That fee shall be paid by attorney Litman to the hospital defendants within twenty days of the sign-ing of this Memorandum—Decision and Order.

Finally, the court denies plaintiff's request for costs associated with the defendants' failure to attend the July 15, 1985 depositions. Given the court's appraisal of plaintiff's counsel's conduct during July through September of 1985, the court need not explain further its decision to deny plaintiff's motion.

## CONCLUSION

The court grants the May 12, 1987 Rule 56 motion for summary judgment of Drs. Bernard Musselman and Michael Severson. The court grants the July 13, 1987 Rule 56 motion for summary judgment brought by the A. Barton Hepburn Hospital and John W. Symons.

The court denies plaintiff's September 5, 1987 motion for costs.[11] The court also denies plaintiff's discovery motion of August 22, 1986.

The court grants, pursuant to Rule 37(a)(4), the September 5, 1985 motion for costs and attorneys' fees brought by A. Barton Hepburn Hospital and John W. Symons.[12] The award of $1,000 shall be paid by attorney Litman within twenty days of the signing of this Memorandum—Decision and Order. The court also grants the September 11 motion by these same defendants for sanctions pursuant to Rule 11 in the amount of $1,500.[13] This amount shall be paid by attorney Litman within twenty days of the signing of this Memorandum—Decision and Order.

It is So Ordered.

---

**11.** This motion was filed on September 16, 1985.

**12.** This motion was filed on September 9, 1985.

**13.** This motion was filed on September 12, 1985.