**Judith NELSON and Darci Anne Bowman, Plaintiff–Appellants, Cross–Appellees,**

v.

**MONROE REGIONAL MEDICAL CENTER, formerly known as the Monroe Clinic, Defendant–Appellee, Cross–Appellant.**

Nos. 89–3110, 89–3234.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 25, 1990.

Decided Feb. 19, 1991.

Rehearing and Rehearing En Banc Denied April 10, 1991.

Peter E. Hans, Schrank & Schultz, Madison, Wis., Raymond E. Schrank, II, Cannon & Dunphy, Milwaukee, Wis., for plaintiffs-appellants, cross-appellees.

James R. Troupis, Michael, Best & Friedrich, Madison, Wis., for defendant-appellee, cross-appellant.

Pamela J. Schmelzer, Monona, Wis., for Association for Retarded Citizens of Wisconsin, amicus curiae.

Before CUDAHY and FLAUM, Circuit Judges, and PELL, Senior Circuit Judge.

FLAUM, Circuit Judge.

Plaintiffs Judith Nelson and Darci Anne Bowman brought suit against defendant Monroe Clinic, alleging constitutional, antitrust, and state-law tort claims arising from defendant's refusal to continue to treat them. The district court dismissed all but the antitrust claims for failure to state a claim. Following the close of discovery, the district court granted summary judgment to defendant on the antitrust claims, ruling that plaintiffs had not demonstrated antitrust injury. Plaintiffs appeal the dismissal of their claims for intentional and negligent infliction of emotional distress and the grant of summary judgment to defendant on their antitrust claims. Defendant cross-appeals the district court's refusal to dismiss on the pleadings plain-

tiffs' antitrust claims for failure to allege facts showing that defendant's acquisition of Monroe Medical Center had a not insubstantial effect on interstate commerce. We affirm the district court's dismissal of the emotional distress claims but reverse its grant of summary judgment on the antitrust claim. In addition, we affirm but modify the district court's conclusion with respect to defendant's effect on interstate commerce. Recognizing, however, that the district court based its grant of summary judgment exclusively on the question of antitrust injury, we remand for renewed summary judgment motions concerning the relevant product and geographic markets and defendant's power in those markets, as well as the nexus between defendant's alleged antitrust violation and interstate commerce.

## I. FACTS AND PRIOR PROCEEDINGS

Darci Bowman is a mildly retarded eighteen year-old. She lives with her mother, plaintiff Judith Nelson, in Monroe, a city of approximately 10,000 inhabitants located in south central Wisconsin. Because of her handicap, Bowman is in need of frequent medical attention. In 1984 and 1985, she received this treatment from, among others, Doctor James Raettig of the Monroe Clinic, a partnership of over 60 physicians providing health care from eight locations in Monroe and surrounding areas of Wisconsin and Illinois. In April, 1985, Bowman brought a malpractice suit against Raettig in Wisconsin state court. After filing the malpractice action, Bowman ceased patronizing Dr. Raettig, instead consulting with Dr. Eric Anderson, a physician at Monroe Medical Center, a clinic employing five physicians located in Monroe. In late 1986 Monroe Clinic acquired Monroe Medical Center. Monroe Medical Center became one of Monroe Clinic's branches and Monroe Medical Center physicians, including Dr. Anderson, joined Monroe Clinic. Bowman withdrew her malpractice claim against Raettig in mid–1987. On January 22, 1988, Nelson and Bowman received a letter from the Monroe Clinic informing them that it would no longer treat either of them on a non-emergency basis and offer-

ing to assist them to find alternate care and to transfer records to the providers they selected.

Plaintiffs allege that this letter was intended to, and did, cause both of them severe emotional distress. Alternatively, they allege that the Monroe Clinic acted negligently because it should have known that the letter would cause extreme emotional distress. Plaintiffs also allege that the merger between Monroe Clinic and Monroe Medical Center has increased concentration in the market for health care in Monroe, with the consequence that the denial of access to any branch of Monroe Clinic is equivalent to the complete denial of access to non-emergency medical care in Monroe and other parts of Green County, Wisconsin. Plaintiffs now obtain medical care in Madison, Wisconsin, some 40 miles north of Monroe. Another consequence of the Clinic's decision to deny them care is to prevent Bowman from obtaining medical care by herself; because she must travel outside Monroe, she must be driven by Nelson. According to Nelson and her employer, the City of Monroe, the need to accompany her daughter on her periodic visits to doctors in Madison has disrupted Nelson's work schedule and caused her to lose wages.

## II. CLAIMS FOR INFLICTION OF EMOTIONAL DISTRESS

### A. Intentional Infliction of Emotional Distress.

■ Plaintiffs first challenge the district court's dismissal of their claim for intentional infliction of emotional distress. On appeal from a dismissal of a claim under Federal Rule of Civil Procedure 12(b)(6),

we must accept as true all the plaintiff's well-pleaded factual allegations and the inferences reasonably drawn from them. *Zinser v. Rose*, 868 F.2d 938, 939 (7th Cir.1989); *Gillman v. Burlington N. R.R.*, 878 F.2d 1020, 1022 (7th Cir.1989). We shall affirm the dismissal only if the plaintiff has failed to allege any set of facts upon which relief can be granted. *Zinser*, 868 F.2d at 939.

*Yeksigian v. Nappi*, 900 F.2d 101, 102 (7th Cir.1990). "In giving the pleadings a liberal construction, however, we are not required to accept legal conclusions either alleged or inferred from the pleaded facts." *Mescall v. Burrus*, 603 F.2d 1266, 1269 (7th Cir.1979); *see* 5 C. Wright & A. Miller, Federal Practice & Procedure (Civil) § 1357 at 595–96 (1969 & Supp.1989).

Under Wisconsin law, "one who by extreme and outrageous conduct intentionally causes severe emotional distress to another is subject to liability for such emotional distress...." *Alsteen v. Gehl*, 21 Wis.2d 349, 358, 124 N.W.2d 312, 317 (1963); *see Estate of Drab v. Anderson*, 143 Wis.2d 568, 572, 422 N.W.2d 144, 146 (Wis.App. 1988).

> "Four factors must be established to prove a claim of intentional infliction of emotional distress: (1) the conduct was intended to cause emotional distress; (2) the conduct was extreme and outrageous; (3) the conduct was the cause of the person's emotional distress, and (4) the emotional distress must be extreme and disabling."

*Stoll v. Adriansen*, 122 Wis.2d 503, 516, 362 N.W.2d 182, 189 (Wis.App.1984), *rev. den.* 122 Wis.2d 782, 367 N.W.2d 222 (1985); *see Alsteen*, 21 Wis.2d at 359–61, 312 N.W.2d at 318; *Laska v. Steinpreis*, 69 Wis.2d 307, 322, 231 N.W.2d 196, 204 (1975). According to the district court, plaintiffs' complaint failed to establish that defendant's decision to terminate its relationships with Bowman and Nelson was sufficiently extreme and outrageous to satisfy the second part of this four-part test. We agree.

■ Since Wisconsin explicitly recognized the tort of intentional infliction of emotional distress in *Alsteen*, its courts have required plaintiffs asserting intention-al infliction claims to show that defendant's conduct was so egregious that "the average member of the community" would regard the acts forming the basis for the claim "as being a complete denial of the plaintiff's dignity as a person." *Alsteen*, 21 Wis.2d at 359–60, 124 N.W.2d at 318.[1]

Wisconsin courts have been reluctant to find that liability existed even where plaintiffs alleged that defendants conducted themselves in a manner far more egregious than the Monroe Clinic did when it ended its relationship with Darci Bowman and Judith Nelson. In *Alsteen*, the first case in which the Wisconsin Supreme Court recognized the tort of intentional infliction of emotional distress, it refused to find that the defendant in that case, a building contractor, had acted in a sufficiently outrageous fashion despite the fact that he had left a job half-done, exposing his elderly client to the elements; when Alsteen complained, he told her that she made him sick. 21 Wis.2d at 353, 124 N.W.2d at 314. Similarly, in *Laska v. Steinpreis*, the Supreme Court affirmed a trial court's decision to sustain a defendant's demurrer to a complaint alleging that the defendant, a landlord, was liable for intentionally inflicting emotional distress on his tenant by spying on the tenant's domestic activities and driving his car at high speed onto the lawn of the leased property, scattering the tenant's children. 69 Wis.2d at 319, 231 N.W.2d at 203.

The three Wisconsin Supreme Court cases in which intentional infliction claims have been upheld also show the extreme nature of the conduct required to state a claim for intentional infliction of emotional distress. In *McKissick v. Schroeder*, 70 Wis.2d 825, 235 N.W.2d 686 (1975), the Wisconsin Supreme Court reversed an or-

1. The Wisconsin Supreme Court explained the rationale for this requirement as follows:

> The requirement that the conduct be extreme and outrageous reflects our concern with the difficulties surrounding proof of the existence of severe emotional harm, and proof of a causal relationship between the injury and the defendant's conduct. If the conduct is gross and extreme it is more probable that the plaintiff did, in fact, suffer the emotional dis-

tress alleged. Moreover, the requirement of extreme and outrageous conduct as a condition of recovery will avoid litigation "in the field of bad manners, where relatively minor annoyances had better be dealt with by instruments of social control other than law."

*Alsteen*, 21 Wis.2d at 360, 124 N.W.2d at 318 (quoting Magruder, *Mental and Emotional Disturbance in the Law of Torts*, 49 Harv.L.Rev. 1033, 1035 (1936)).

der of a trial court sustaining defendant Schroeder's demurrer to plaintiff McKissick's intentional infliction claim. Mrs. McKissick alleged that she had seen defendant Schroeder, a policeman, shoot her son and that after the shooting, as her son lay bleeding to death, the policeman questioned Mrs. McKissick rather than calling for medical assistance. In *Slawek v. Stroh*, 62 Wis.2d 295, 215 N.W.2d 9 (1974), the Supreme Court reversed the order of a trial court sustaining a demurrer to a complaint, in which plaintiff alleged that a former paramour had sought to continue their relationship "by his intentional physical acts in repeatedly telephoning her and her family at all hours of the day and night, interrupting her sleep and other activities ... [and] by wild and false ruses, stories, and the use of false names...." *Id.* at 314, 215 N.W.2d at 20. And in *Scarpaci v. Milwaukee County*, 96 Wis.2d 663, 292 N.W.2d 816 (1980), the Supreme Court reversed the order of the trial court sustaining defendants' demurrer to the Scarpacis' complaint, which alleged that the defendants, county coroners and their employer, had performed an unauthorized autopsy on the body of plaintiffs' daughter after having been told by plaintiffs that they did not wish this procedure to be performed. *Id.* at 666, 292 N.W.2d at 818.

■ Guided by these cases, we cannot say that the actions of the Monroe Clinic in terminating its relationship with Darci Bowman or Judith Nelson were sufficiently "extreme and outrageous," *Alsteen*, 21 Wis.2d at 359, 124 N.W.2d at 317, to state a claim under Wisconsin law. The Clinic's letter did not completely deny the personal dignity of Bowman or Nelson. *See id.* at 359–60, 124 N.W.2d at 318. In recognition of their continued medical needs, the Clinic offered to assist them in finding an alternate provider of medical care and allowed them ten days in which to find this provider. The Clinic also implied that it would continue to provide emergency services to Bowman and Nelson, which may have been of some comfort given the geographical proximity of their home to two of the Clinic's branches and the alleged lack of alternate medical facilities in their immediate vicinity. Moreover, the tone of the letter was dispassionate, and no reasonable juror could read it as calculated to insult or belittle Bowman or Nelson, much less completely to deny their basic human dignity. While the letter undoubtedly upset Bowman and Nelson, so did the landlord's conduct in *Steinpreis* and the contractor's actions in *Alsteen*. As the district court correctly held, Wisconsin law requires more than upset or irritation to state a claim for intentional infliction of emotional distress. The Clinic's termination of its relationship with Bowman, a mentally handicapped young adult, was surely not a generous response to a malpractice suit whose filing Bowman likely did nothing to bring about. Nonetheless, we agree with the district court that it did not create a cause of action for intentional infliction of emotional distress under Wisconsin law.

### B. Negligent Infliction of Emotional Distress.

■ We turn next to plaintiffs' claim for negligent infliction of emotional distress.[2] Plaintiffs allege that defendant breached a duty it owed to them when it terminated its relationship with both Bowman and Nelson, causing foreseeable and extreme emotional distress. Defendant counters with the well-known legal principle that a physician owes no duty to continue to treat particular patients. It argues that since it was under no duty to continue to treat Bowman or Nelson, it breached no duty when it chose to discontinue the relationship. We disagree with defendant's reasoning. "[R]eliance upon a no duty-no liability theory is misplaced in Wisconsin: a 'duty' exists when it is established that it was foreseeable that an act or omission to act may cause harm to someone." *Schus-*

---

2. There is some debate between the parties concerning whether plaintiffs' complaint contains a claim for negligent infliction of emotional distress. It is true that the heading of the emotional distress count of plaintiffs' complaint is "CAUSE OF ACTION NUMBER ONE: Intentional Infliction of Emotional Distress." However, throughout the body of the count, plaintiffs allege both intentional and negligent infliction of emotional distress. *See, e.g.* ¶¶ 41, 45.

*ter v. Altenberg,* 144 Wis.2d 223, 237–38, 424 N.W.2d 159, 165 (1988). While *Altenberg* was a malpractice case, we read the discussion in that case as applicable to all negligence actions. *See id.* at 238, 424 N.W.2d at 165. As applied to this case, *Altenberg* suggests that the law's understandable hesitance to impose a duty on a physician to continue to treat a patient is not relevant to the question of whether a physician might terminate a patient in such a callous fashion as to give rise to a claim for negligent infliction of emotional distress.

We do, however, agree that plaintiff has failed to state a claim for negligent infliction of emotional distress. "The general rule in Wisconsin is that, to recover for the negligent infliction of emotional distress, the 'plaintiff's emotional distress must be manifested by physical injury.'" *Meracle v. Children's Serv. Soc'y,* 149 Wis.2d 19, 28, 437 N.W.2d 532, 535 (1989) (quoting *Garrett v. City of New Berlin,* 122 Wis.2d 223, 231, 362 N.W.2d 137, 142 (1985)). The policy underlying the "reluctance" to allow recovery for negligent infliction of emotional distress without accompanying physical injury "is the fear of flooding the courts with fraudulent claims and exposing defendants to potentially unlimited liability for every type of mental disturbance." *LaFleur v. Mosher,* 109 Wis.2d 112, 115, 325 N.W.2d 314, 316 (1982). In *LaFleur,* the Wisconsin Supreme Court grafted a narrow exception onto this rule, recognizing that certain circumstances of negligent confinement could give rise to a claim for negligent infliction of emotional distress. 109 Wis.2d at 119, 325 N.W.2d at 317. The Court created this exception because it determined that an extended period of confinement caused by the negligent act of another "by its very nature has the special likelihood of causing

real and severe emotional distress." *Id.* at 119, 325 N.W.2d at 317. Three years later in *Meracle,* the Court observed that *"LaFleur* involved unique facts and the decision emphasized the narrowness of its holding." 149 Wis.2d at 29, 437 N.W.2d at 536. In deciding this pendent state claim, we are unwilling "to speculate on any trends in state law," *Shaw v. Republic Drill Corp.,* 810 F.2d 149, 150 (7th Cir.1987), that would lead the Wisconsin Supreme Court to expand the narrow exception recognized in *LaFleur* to cover the facts of this case, which present no "similar guarantee of the genuineness and severity of the injury," *Meracle,* 149 Wis.2d at 29, 437 N.W.2d at 536, that Nelson and Bowman suffered when Monroe Clinic terminated its relationship with them.

## III. ANTITRUST CLAIM

### A. *Antitrust Injury.*

In their complaint, plaintiffs alleged two antitrust claims, both related to the merger between the Monroe Clinic and Monroe Medical Center. The first claim alleged that the merger was a contract or combination in restraint of trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. The second claim alleged that, through the merger, the Monroe Clinic sought to monopolize the provision of medical services in Monroe and its environs, in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.[3] Unlike plaintiffs' emotional distress claims, these two antitrust claims survived defendant's Rule 12(b)(6) motion to dismiss.

Discovery concerning the antitrust claims proceeded, and at the close of discovery defendant filed a motion for summary judgment. The district court granted summary judgment to defendant because of what it viewed as plaintiffs' failure "to

---

**3.** At a late stage of this litigation in the district court, plaintiffs indicated that they sought relief as well under Section 7 of the Clayton Act, 15 U.S.C. § 18. Defendant argues that this claim was not raised in a timely fashion below and that we are consequently precluded from considering it on appeal. This issue is mooted by this court's decision in *United States v. Rockford Memorial Hosp.,* 898 F.2d 1278 (7th Cir.), *cert.*

denied, ⸺ U.S. ⸺, 111 S.Ct. 295, 112 L.Ed.2d 249 (1990). In that case, we observed that, as applied to mergers, the judicial interpretations of § 1 of the Sherman Act (which plaintiffs pleaded and preserved for appeal), and § 7 of the Clayton Act (which defendant argues was not raised below), "have, after three quarters of a century, converged." *See id.* at 1281–82.

demonstrate any relationship between any anticompetitive conduct and the denial of care to plaintiffs and their resulting injuries." August 29, 1989 Memorandum Opinion ("Mem. Op.") at 7. Specifically, the district court observed that the plaintiffs had "been unable to provide evidence to support" the antitrust violations they alleged, "such as evidence that other former patients have been denied care because of filing lawsuits against the defendant." *Id.* The district court concluded that "[w]hile defendant may have caused plaintiff[s] some unfortunate concerns, any loss suffered by them simply cannot be considered an antitrust injury which flows from the public injury to competition which the antitrust laws regulate, 'which means injury from higher prices or lower output, the principal vices prescribed by the antitrust laws.'" *Id.* at 8–9 (quoting *Ball Memorial Hosp. v. Mutual Hosp. Ins.*, 784 F.2d 1325, 1334 (7th Cir.1986)).

We respectfully disagree with the district court's conclusion that plaintiffs have failed to demonstrate that the injury they suffered when the Clinic terminated its relationship with them is not an injury cognizable under the antitrust laws. Private civil actions to enforce the Sherman Act are allowed under § 4 of the Clayton Act, 15 U.S.C. § 15. That section provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore...." Despite the "comprehensive" language of § 4, *Mandeville Island Farms, Inc. v. American Crystal Sugar*, 334 U.S. 219, 236, 68 S.Ct. 996, 1006, 92 L.Ed. 1328 (1948), the Supreme Court has recognized that " 'Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.' " *Associated General Contractors of California v. California State Council of Carpenters*, 459 U.S. 519, 534, 103 S.Ct. 897, 906, 74 L.Ed.2d 723 (1983) (quoting *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 263 n. 14, 92 S.Ct. 885, 891–92 n. 14, 31 L.Ed.2d 184 (1972)); *see also Illinois Brick Co. v. Illinois*, 431 U.S. 720, 761, 97 S.Ct. 2061, 2082–83 n. 14, 52 L.Ed.2d 707 (1977) (Bren-

nan, J., dissenting) ("I concede that despite the broad wording of § 4 there is a point beyond which the wrongdoer should not be held liable."); *Southwest Suburban Bd. of Realtors v. Beverly Area Planning Auth.*, 830 F.2d 1374, 1377 (7th Cir.1987); *Repp v. F.E.L. Publications*, 688 F.2d 441, 444 (7th Cir.1982).

In *Blue Shield of Virginia v. McCready*, the Supreme Court, reviewing its past decisions, identified "two types of limitation on the availability of the § 4 remedy to particular classes of persons and for redress of particular forms of injury." 457 U.S. 465, 473, 102 S.Ct. 2540, 2545, 73 L.Ed.2d 149 (1982). The concern animating the first limitation, announced in *Standard Oil, supra*, and *Illinois Brick, supra*, was "the risk of duplicative recovery engendered by allowing every person along a chain of distribution to claim damages arising from a single transaction that violated the antitrust laws." *McCready*, 457 U.S. at 474–75, 102 S.Ct. at 2545–46. The second limitation identified in *McCready* concerned "the conceptually more difficult question 'of which persons have sustained injuries *too remote* [from an antitrust violation] to give them standing to sue for damages under § 4.' *Illinois Brick Co. v. Illinois*, 431 U.S., at 728, n. 7 [97 S.Ct. at 2065–66, n. 7] (emphasis added)." *McCready*, 457 U.S. at 476, 102 S.Ct. at 2546.

A year after *McCready*, the Supreme Court revisited the limitations on the reach of § 4 identified in that case. In *Associated General Contractors, supra*, the Court recognized that, in light of "the infinite variety of claims" that might arise under § 4, it was "virtually impossible to announce a black-letter rule that will dictate the result in every case." 459 U.S. at 536, 103 S.Ct. at 908. Instead of promulgating such a rule, the Court pointed to various "factors that circumscribe and guide the exercise of judgment in deciding whether the law affords a remedy in specific circumstances." *Id.* at 537, 103 S.Ct. at 908. The first of these factors was the causal connection between the damages claimed by the antitrust plaintiff and the harm to the plaintiff; the second was the

nature of the injury suffered by the plaintiff and the relationship between that injury and the type of conduct sought to be redressed by providing a private remedy for antitrust violations; the third was the directness of the asserted injury and, closely related, the risk of duplicate recoveries or (conversely) the difficulties of apportioning damages among various classes of plaintiffs. *See id.,* 459 U.S. at 537–45, 103 S.Ct. at 908–12.

Taking the last of the three factors identified in *Associated General Contractors* first, we note that this case raises no concerns of duplicative recoveries or difficulties in apportioning the damages plaintiffs claim between them or others injured by defendant's merger. The damages Nelson and Bowman claim were directly caused by the Clinic's exercise of its market power. There was no intervening party that passed along the harm caused by its refusal to continue to treat the plaintiffs. *Compare Illinois Brick,* 431 U.S. at 737–43, 97 S.Ct. at 2070–73; *Standard Oil,* 405 U.S. at 261–64, 92 S.Ct. at 890–92.

Plaintiffs have satisfied the first of the three factors set out in *Associated General Contractors* as well: while their pleadings and motions in the district court and their briefs before this court have been less than models of clarity, their complaint nevertheless sufficiently alleges that the merger of the Monroe Clinic and Monroe Medical Center served to monopolize the provision of health care in Monroe and its environs, with the effect of restraining commerce. Second Amended Complaint, ¶ 129. We are mindful of the Supreme Court's statement in *Associated General Contractors* that "the mere fact that the claim is literally encompassed by the Clayton Act does not end the inquiry." 459 U.S. at 537, 103 S.Ct. at 908. Here, however, the causal connection between the merger and the plaintiffs' diminished access to health care is more direct and obvious than was the causal connection between the defendant Associated General Contractors' exhorta-

tion of its members and others to hire non-union workers and the damage allegedly suffered by the plaintiff union. *See* 459 U.S. at 526–28, 103 S.Ct. at 902–03.

Throughout its brief, defendant argues that plaintiff has failed to show that the injury it suffered was causally related to the merger because the denial of medical care is not the kind of injury that normally flows from the absence of competition in a market. This argument fails to recognize that, but for the merger, plaintiffs might still be enjoying the services of Doctor Anderson and the Monroe Medical Center rather than travelling to Madison because the Monroe Medical Center, now part of Monroe Clinic, refuses to see them. As the Supreme Court observed in *Associated General Contractors,* "[t]here is a similarity between the struggle of common-law judges to articulate a precise definition of 'proximate cause' and the struggle of federal judges to articulate a precise test to determine whether a party injured by an antitrust violation may recover treble damages." 459 U.S. at 535, 103 S.Ct. at 907 (footnote omitted). Similarly, in *McCready* the Court observed that, "[i]n the absence of direct guidance from Congress, and faced with the claim that a particular injury is too remote from the alleged violation to warrant § 4 standing, the courts are thus forced to resort to an analysis no less elusive than that employed traditionally by courts at common law with respect to the matter of 'proximate cause.'" 457 U.S. at 465, 102 S.Ct. at 2540. In the law of torts, the fact that damage would not have occurred but for defendant's tortious conduct is, as a rule, sufficient to establish causation in fact. *See* 4 F. Harper, F. James & O. Gray, The Law of Torts § 20.1 at 91–92 (2d ed. 1986). And applying the test of proximate cause "currently prevailing in this country," *id.,* § 20.5 at 138, it was arguably foreseeable to defendant that, in view of its alleged market power in the community following the merger,[4] their re-

---

**4.** Nelson and Bowman have supported their allegation that defendant now possesses inordinate market power with evidence presented by an expert witness suggesting that the effect of

the merger in the relevant market they propose has been to substantially lessen competition through the elimination of a small but significant competitor. *See* Affidavit of Harold S. Luft

fusal to continue to treat plaintiffs would cause harm to them arising from the paucity or complete absence of nearby alternate providers of medical services to whom plaintiffs could turn.

We come to the second of the three *Associated General Contractors* factors, the presence or absence of an injury " 'of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws.' " 459 U.S. at 538, 103 S.Ct. at 909, quoting *McCready*, 457 U.S. at 483, 102 S.Ct. at 2550; *see Atlantic Richfield Co. v. USA Petroleum*, —— U.S. ——, 110 S.Ct. 1884, 1889, 109 L.Ed.2d 333 (1990) ("[I]njury, although causally related to an antitrust violation, nevertheless will not qualify as 'antitrust injury' unless it is attributable to an anti-competitive aspect of the practice under scrutiny...."); *Brunswick Corp. v. Pueblo Bowl–O–Mat*, 429 U.S. 477, 489, 97 S.Ct. 690, 697–98, 50 L.Ed.2d 701 (1977) ("Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."); *Wilk v. American Medical Ass'n*, 895 F.2d 352, 364 (7th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 2621, 110 L.Ed.2d 642 (1990); *Southwest Suburban Bd. of Realtors v. Beverly Area Planning Ass'n*, 830 F.2d 1374, 1377 (7th Cir.1987). The injury Nelson and Bowman allege is that the merger between Monroe Clinic and Monroe Medical Center increased the Clinic's market power and limited plaintiffs' opportunity to obtain medical care in Monroe once the Clinic

chose to terminate its relationship with them.

As this Court recognized in *Ball Memorial Hosp. v. Mutual Hosp. Ins.*, "[w]henever the plaintiff and consumers have divergent rather than congruent interests, there is a potential problem in finding 'antitrust injury'.... When the plaintiff is a poor champion of consumers, a court must be especially careful not to grant relief that may undercut the proper functions of antitrust." 784 F.2d 1325, 1334 (7th Cir.1986). In this case, plaintiffs are not "poor champions" of the consumer interest in vigorous competition in the market for medical services in Monroe. As defendant concedes, "antitrust injury 'means injury from higher prices or lower output, the principal vices proscribed by the antitrust laws.' " Brief at 35, quoting *Ball Memorial*, 784 F.2d at 1334. The facts show that one possible effect of the merger between Monroe Medical Center and Monroe Clinic—perhaps the only one that has manifested itself thus far—has been a reduction in the output of the merged entity relative to its parents: the Clinic no longer treats Nelson and Bowman. Defendant argues that this injury, the denial of non-emergency medical services, is not the type the antitrust laws are intended to remedy. We are unable to agree. Monopolists are more likely to turn away prospective clients because they do not feel the same competitive pressure to serve all comers. This explains why we recognized in *Ball Memorial* that "injury from ... lower output" was one of the "principal vices proscribed by the antitrust laws." [5] 784 F.2d at 1334. A clinic in a

at 24–25 (merger caused Herfindahl indices of competition in market for physician visits in three zip-code area including Monroe to increase by over 1,100 to 4,472); *compare* Department of Justice Merger Guidelines § 3.11(c), *reprinted*, 4 Trade Reg.Rep. (CCH) ¶ 13,103 at 20,561 (Department of Justice is likely to challenge mergers resulting in post-merger Herfindahl index of over 1,800 where merger increases Herfindahl index by more than 50).

Defendants, as one might expect, describe the relevant market as encompassing a larger area and justify their acquisition by pointing to the low barriers to entry into the medical care market and the presence of larger chains of clinics in urban centers near Monroe such as Madison, Janesville–Beloit, and Rockford. We do not

reach the merits of this aspect of the dispute, which the parties are invited to address in the district court through renewed motions for summary judgment.

5. Alternatively, one could view the Clinic's refusal to treat Nelson and Bowman as an infinite increase in the price it charges them for treatment. This characterization may be particularly relevant in the market for health care, where the price set for treatment is often negotiated not between patient and physician but between patient's insurer and physician. The Clinic may thus have been unable to charge Nelson and Bowman a higher price for the treatment it provided them to reflect the heightened risk (demonstrated by their past behavior) that it

more competitive marketplace might have preferred to let bygones be bygones, opting for the insurance payments and other remuneration it would receive for treating Bowman and Nelson and accepting the risk that they would again sue for malpractice. Monroe Clinic's failure to do so in a marketplace rendered non-competitive by its merger with a competitor is an injury that can be said to be directly caused by an absence of competition, the kind of injury the antitrust laws were intended to prevent and redress.

Moreover, even if plaintiffs have suffered an injury of a kind unique to them, they have alleged and introduced facts to support the view that "an injury to the market" has occurred that has claimed them as its first victims. *Car Carriers v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir.1984), *cert. denied*, 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985). If plaintiffs' allegations and their experts' testimony concerning the dominance the Monroe Clinic has achieved in the provision of medical services in the Monroe area are true, an issue we do not reach, it is not difficult to predict what the future holds: "The higher the aggregate market share of a small number of suppliers, the easier it is for them to increase price above the competitive level without losing so much business to other suppliers as to make the price increase unprofitable; this is the power we call market power." *United States v. Rockford Memorial Hosp.*, 898 F.2d 1278, 1283 (7th Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 295, 112 L.Ed.2d 249 (1990).

### B. Interstate Commerce.

 In allowing plaintiffs' antitrust claims to survive defendant's Rule 12(b)(6) motion to dismiss, the district court rejected defendant's argument that plaintiffs had failed to allege facts demonstrating that defendant's activities had a not insubstantial effect on interstate commerce,

bringing defendant within the ambit of the antitrust laws. Later in the litigation, in its motion granting summary judgment to defendant on the antitrust claims, the district court explicitly found that plaintiffs had satisfied their burden of showing the nexus between the defendant's activities and interstate commerce, appearing to grant summary judgment on this issue to plaintiffs. The district court based this conclusion on its finding that "defendant has clinics in Illinois and a large percentage of out-of-state patients, thus placing its conduct in interstate commerce." Mem. Op. at 6. In its cross-appeal, defendant challenges the district court's ruling on the motion to dismiss, arguing that plaintiffs failed to allege facts in their complaint sufficient to establish a nexus between defendant's challenged conduct and interstate commerce and that the district court applied the incorrect legal standard in making its determination that defendant acted in interstate commerce. We agree with defendant that the district court erred in looking to the nexus between defendant's business activities as a whole and interstate commerce rather than the relationship between the alleged antitrust violation and interstate commerce, but affirm the district court's conclusion to the extent that we hold that there remains a question of material fact as to whether the merger between Monroe Clinic and Monroe Medical Center had a not insubstantial effect on interstate commerce.

 "It is axiomatic that in pleading a cause of action under the Sherman Act §§ 1, 2, the plaintiff must adequately allege the jurisdictional requirement of interstate commerce." *Marrese v. Interqual, Inc.*, 748 F.2d 373, 379 (7th Cir.1984), *cert. denied*, 472 U.S. 1027, 105 S.Ct. 3501, 87 L.Ed.2d 632 (1985); *see McLain v. Real Estate Board*, 444 U.S. 232, 241, 100 S.Ct. 502, 508–09, 62 L.Ed.2d 441 (1980); *Seglin v. Esau*, 769 F.2d 1274, 1276 (7th Cir.1985).

---

would later have to pay to litigate a malpractice case. Unable to bargain for compensation for this increased risk in the form of higher fees, the Clinic chose not to treat Bowman and Nelson at all. In a competitive market this would not be wrongful, at least absent a concerted

refusal by unaffiliated doctors to deal with a past malpractice plaintiff. *See Williams v. St. Joseph Hosp.*, 629 F.2d 448, 452 (7th Cir.1980). In a market made non-competitive by a merger, it is the kind of "price increase" that is a central concern of the Sherman Act.

There is "a split in the circuits as to whether a plaintiff must show a nexus between interstate commerce and defendant's general business activities or whether the requisite connection must be between interstate commerce and defendant's challenged (i.e. allegedly unlawful activities)." *Anesthesia Advantage v. Metz Group,* 912 F.2d 397, 401 (10th Cir.1990).[6] In its decision in *Seglin v. Esau, supra,* the Seventh Circuit aligned itself with those circuits that require that the plaintiff show the relationship between the challenged conduct and interstate commerce. *Seglin,* 769 F.2d at 1279 (" '[T]he inquiry must be whether the defendants' activity that has allegedly been infected by unlawful conduct can be shown as a matter of practical economics to have had a not insubstantial effect on the interstate commerce involved.' ") (quoting *Furlong v. Long Island College Hospital,* 710 F.2d 922, 925–36 (2d Cir.1983)) (internal quotations omitted); *see also McLain,* 444 U.S. at 246, 100 S.Ct. at 511. In conducting this inquiry, it is not enough to find that the antitrust defendant operates in more than one state, because even a business that operates on a national or global scale may be accused of anti-competitive conduct with a purely local impact. For this reason, it was error for the district court to abbreviate the interstate commerce inquiry it performed in deciding defendant's summary judgment motion upon discovering that the Monroe Clinic operated clinics in both Wisconsin and Illinois.

In *Seglin, supra,* the antitrust plaintiff, a doctor suing his former employer, a psychiatric hospital which had terminated his staff privileges, alleged that the hospital "provide[d] psychiatric services to patients who travel in interstate commerce to receive such services.... purchase[d] and receive[d] equipment and supplies in interstate commerce.... [and] receive[d] payments in interstate commerce from [ ] government agencies and private insurance carriers...." 769 F.2d at 1275–76. Similarly, in *Doe on Behalf of Doe v. St. Joseph's Hosp.,* 788 F.2d 411 (7th Cir.1986),

another case arising from a hospital's decision to revoke a physician's staff privileges, we affirmed the dismissal on the pleadings of the plaintiff's antitrust claims where the complaint alleged only that defendant purchased drugs and medical equipment in interstate commerce, received insurance payments from out-of-state private and public entities, provided medical services to out-of-state patients, and shared information and medical training across state lines. *See* 788 F.2d at 417.

We acknowledge that plaintiffs' complaint in this case contains no more factual detail concerning defendant's relationship with interstate commerce than the complaints we found inadequate in *Seglin* and *Doe.* Like those complaints, plaintiffs' complaint here alleges defendant's ties to interstate commerce by pointing to the volume of health care services the Monroe Clinic provides to individuals from other states, the employment available to persons from other states at the Clinic's branches, and the flow of medical insurance and loans from out of state to the Clinic.

As in *Seglin,* however, this is not the end of our inquiry. The dismissal in *Seglin* was based both on the lack of factual specificity concerning the nexus between defendant's challenged conduct and interstate commerce and the plaintiff's failure to allege a plausible connection between the antitrust violation alleged and a potential impact on interstate commerce. *See Seglin,* 769 F.2d at 1281–82 (discussing *Tarleton v. Meharry Medical College,* 717 F.2d 1523 (6th Cir.1983)). In the present case, plaintiffs' complaint is short on factual detail, but it does allege how, " 'as a matter of practical economics,' " the anti-competitive effects of the Monroe Clinic's merger with Monroe Medical Center may lead to concentration, decreased output, and increased prices, causing a reduction in the demand for medical services among the former Monroe Medical Center's interstate clientele, decreasing Monroe Clinic's demand for medical equipment and supplies

---

**6.** The Supreme Court has indicated that it may soon resolve this conflict. *See Pinhas v. Summit Health,* 894 F.2d 1024, 1031–32 (9th Cir. 1989), *cert. granted,* —— U.S. ——, 110 S.Ct. 3212, 110 L.Ed.2d 660 (1990).

purchased out-of-state, and lowering the number and value of insurance payments it receives from out of state. *See* Plaintiffs' Second Amended Complaint, ¶¶ 121–127, 129–35. In this regard, we find this case to be like *Marrese*, 748 F.2d at 379–80, where we held that an antitrust plaintiff physican denied staff privileges could satisfy the interstate commerce nexus by pointing to the specific effects on interstate commerce his exclusion by the defendant hospital had on interstate commerce. While in *Marrese* plaintiff supported this allegation with facts concerning the amount of interstate commerce affected by defendant's action, we are reluctant to hold that the inquiry into the sufficiency of an antitrust plaintiff's complaint should turn on the plaintiff's access to statistical information at an early stage of litigation, when this information will likely be in the sole possession of the defendant. Our reluctance is particularly strong in this case, where much of the information concerning the effect of the merger on interstate commerce was, before discovery, completely inaccessible to defendants and was only released by defendants pursuant to a stipulation of confidentiality. *See McLain*, 444 U.S. at 243, 100 S.Ct. at 509–10 ("Nor is jurisdiction defeated in a case relying on anticompetitive effects by plaintiff's failure to quantify the adverse impact of defendant's conduct."); *Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976) ("rigorous standard" applied in considering antitrust defendants' motions to dismiss for failure ·to show nexus with interstate commerce is appropriate, because " 'the proof is largely in the hands of the alleged conspirators.' ") (quoting *Poller v. Columbia Broadcasting*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962)); *see also Williams v. St. Jo-*

*seph Hosp.*, 629 F.2d 448, 453–454 (7th Cir.1980).[7]

In its brief, defendant directs its interstate commerce challenge to the district court's ruling on its motion to dismiss plaintiff's antitrust claims. Because the district court's application of an incorrect legal standard led it to terminate its interstate commerce inquiry before it reached the question of whether discovery had revealed facts suggesting that defendant's alleged antitrust violations had a not insubstantial nexus with interstate commerce, we remand for renewed summary judgment motions on this question.

## IV. CONCLUSION

We have concluded that plaintiffs have cleared two hurdles to the maintenance of an antitrust claim challenging the merger between the Monroe Clinic and the Monroe Medical Center. There remain, however, other obstacles in plaintiffs' path which we do not address, and which nothing in this opinion should be read as prejudging, notably the difficult questions of determining the relevant product and geographic markets and assessing defendant's power in those markets. In resolving this question, the district court should be guided by the burgeoning case law concerning mergers between providers of medical services, including this Circuit's recent decision in *Rockford Memorial Hosp.*, 898 F.2d 1278.

To sum up, we affirm the district court's dismissal of plaintiffs' emotional distress claims but reverse its grant of summary judgment on their antitrust claims. In addition, we modify the district court's conclusion with respect to the nexus between the merger between the Monroe Clinic and Monroe Medical Center and interstate commerce. We remand for renewed summary judgment motions concerning the relevant

---

**7.** This does not mean that we will not impose on antitrust plaintiffs the duty to plead all facts likely to be in their possession at the time they initiate litigation or subsequently amend their complaint that show the nexus between the defendant's challenged conduct and interstate commerce. *See Seglin*, 769 F.2d at 1283 n. 11. Rather, as we anticipated in *Seglin*, "[t]here may be cases in which all facts supporting the re-

quirement of a nexus with interstate commerce are within the defendant's exclusive knowledge." *Id.* In those cases, complaints like the one in this case, which do not contain a welter of factual detail but do set out a plausible theory as to how defendant's anti-competitive conduct impacted interstate commerce, may survive a motion to dismiss.

product markets and defendant's power in those markets, as well as the nexus between the merger and interstate commerce.

CUDAHY, Circuit Judge, concurring:

I am completely in accord with the analysis and conclusions of the majority opinion. Whatever deficiencies the plaintiff's antitrust claims may eventually evince, they are certainly not lacking as allegations of antitrust injury. In fact, the plaintiff has suffered what is the very essence of antitrust injury. The merger of the Monroe Clinic and the Monroe Medical Center has ostensibly eliminated all competition in the provision of medical services in the Green County market. It was this elimination of competition and the resulting effective monopoly position of the Monroe Clinic that made the Clinic's refusal to deal with Darci Bowman injurious to her. Because she had no other supplier with which to deal, Bowman was forced to seek service in another market allegedly to her detriment. The injury to her was thus the direct result of the injury to competition. Although perhaps not a matter of major moment in dollars and cents, the merger and the related refusal to deal lie at the heart of the evils addressed by the antitrust laws. Further development of the facts underlying market definition and other matters may very well exculpate the Monroe Clinic, but a finding of antitrust injury certainly requires no extension of well-accepted antitrust principles and concepts.

With respect to the interstate commerce nexus, we must observe caution when importing principles derived from cases involving denial of staff privileges to the different context of the provision of medical service. We are concerned here with the issue of delivery of the Clinic's principal product—a matter at the very core of its economic activity. In these circumstances, we should not give the jurisdictional requirements of the Sherman Act an inappropriately narrow reading.

PELL, Senior Circuit Judge, concurring in part, dissenting in part.

I concur in the majority's affirmance of the district court's judgment dismissing the plaintiffs' state-law tort claims, but being satisfied that the localized scenario presented by the record in this case fails to present an antitrust claim under either the Sherman or Clayton Acts, I respectfully dissent from that part of the majority opinion.

To put this case in context, I think it helpful to note the following. The position of the plaintiffs, of course, evokes sympathy. They are apparently unable to consult a doctor for non-emergency reasons in their home area. They have been regularly, as needed, receiving medical attention in Madison, the state capital, where the medical practitioners, if not providing more competent service, are at least equal to those in Monroe. They complain that traveling to Madison occasions some inconvenience and additional expense, although the time and mileage involved resembles what many people in outlying suburban areas of Chicago will incur in receiving medical services at facilities in the central city. But sympathy, which should not be an element in this case, in any event, is even-handed between the litigants.

The present litigation arises out of the fact that plaintiff's claim that their failure to be able to secure medical services in Green County, Wisconsin, is because of action of the defendant barring any non-emergency treatment. This is described as retaliatory on the part of the Monroe Clinic because of a malpractice suit filed in April 1986 against it and also a Dr. Raettig, who had been a treating physician of plaintiff Darci Anne Bowman, the slightly retarded daughter of her co-plaintiff Judith Nelson. Whether or not it is against public policy under certain circumstances to compel a physician to continue to serve a patient who has filed a malpractice action against him, is not involved in the present situation, although perhaps it should be.

The undisputed facts are that the malpractice action was begun without consultation with a single medical expert, without consultation with the treating physician, and without having obtained the medical records of the Monroe Clinic. Dr. Raettig

was understandably shocked by the filing of the suit as he had had no contact with the plaintiffs concerning the urinary tract infection which formed the basis of their malpractice action. In addition to the fact that no medical expert had been consulted prior to plaintiffs' filing suit, discovery developed that not even the physician who corrected the supposed medical error had been consulted. The suit remained pending for sixteen months. Finally after consulting medical experts, the attorney for the plaintiffs concluded he could not make out a case against the Clinic and Dr. Raettig and he dismissed the action. In a few words, the malpractice action was frivolous from the beginning and never achieved any other status.

In an antitrust or any other context, it appears obvious that the action taken by the Clinic in refusing to provide medical services to Nelson or her daughter could not be the basis of recovering damages single compensatory or tripled. The mere fact that the clinic apparently included all of the doctors in Green County should not alter the situation. The principle is made clearer if in a sparsely populated area in the northwest of this country there were only two physicians in a county who were in partnership in practice and one was sued in a suit as frivolous as the one with which we are dealing. Both he and his partner declined any further medical services which would mean many miles of travel for one who needed non-emergency treatment. Can it be doubted even though they constituted a monopoly that this was not within the ambit of the antitrust statute?

Judith Nelson was distressed by having some minor travel and by job problems. We should not overlook that Dr. Raettig's distress must have been more acute. One of the most priceless attributes of a practitioner of a profession is that of high quality and effective use of that ability. Holding these attributes up to doubt by the filing of a malpractice suit can be most hurtful.

Monroe is not a large community but one which by its size suggests that not everything that is known to most of the residents needs be in the written or spoken media. Yet for sixteen months Dr. Raettig was smeared by the brush of having committed malpractice. Often the effect of such an accusation lingers in the minds of some even though proved not to be correct. It may be many years before the falsely imposed blemish on his reputation completely disappears.

In considering this appeal, I would be perfectly content just to affirm across the board, however, I recognize that to the extent the district judge opined that the facts were sufficient to require an examination of the antitrust phase of the action, a straight affirmance would be approving that part of his decision. Because I do not believe that antitrust has any place in this action, I think it necessary for us to consider it but I do not agree with the majority that it is necessary to remand for further consideration by the district court.

The Clinic has cross-appealed the district court's rejection of three of its contentions, namely that (a) the defendant's alleged illegal conduct did not involve multiple actions as required by the antitrust statutes, (b) the alleged illegal conduct bore no connection to interstate commerce, and (c) the defendant did not possess market power in a relevant market as required by federal antitrust statutes.

These three, of course, can be raised and considered here on the basis of the whole record for the purpose of defending the judgment under attack.

Section 1 of the Sherman Act requires, as a fundamental prerequisite, a contract, combination or conspiracy—a concerted action by a plurality of actors. Section 1 does not prohibit independent business actions or decisions by a single entity. This central concept has been stated most succinctly by this court:

> [s]ection 1 of the Sherman Act prohibits contracts, combinations, or conspiracies unreasonably restraining trade or commerce. The fundamental prerequisite is unlawful conduct by two or more parties pursuant to an agreement, explicit or implied. Solely unilateral conduct, regardless of its anti-competitive effects

is not prohibited by Section 1. Rather, to establish an unlawful combination or conspiracy, there must be evidence that two or more parties have knowingly participated in a common scheme or design to accomplish an anti-competitive purpose. *Contractor Utility Sales Co. v. Certain–Teed Products Corp.*, 638 F.2d 1061, 1074 (7th Cir.1981). *See also Albrecht v. The Herald Co.*, 390 U.S. 145, 149, 88 S.Ct. 869, 871, 19 L.Ed.2d 998 (1968); *Weit v. Continental Illinois Nat'l Bank & Trust Co.*, 641 F.2d 457, 468–69 (7th Cir.1981), *cert. denied*, 455 U.S. 988, 102 S.Ct. 1610, 71 L.Ed.2d 847 (1982); *Trabert & Hoeffer, Inc. v. Piaget Watch Corp.*, 633 F.2d 477, 480 (7th Cir.1980). The plaintiffs must demonstrate that the Monroe Clinic plus at least one other independent entity knowingly participated in an unlawful scheme to achieve an anticompetitive purpose. Despite the Motion for Summary Judgment of the Monroe Clinic raising the issue, the district court did not consider this fundamental requirement in its dismissal Order. Had it done so, it would certainly have found no such plurality.

The district court did find that there was no relationship between the act of monopolization and the decision to deny care. That act, however, of denying non-emergency medical service was an act by the Monroe Clinic alone. There simply were no other actors—so there could be no Section 1 violation. By finding no direct relationship between the action to deny care on January 22, 1988, and the merger of the Medical Center of Monroe Clinic, the court was finding in effect that the Monroe Clinic acted alone in its decision to deny care.

The Monroe Clinic is a medical partnership organized pursuant to Chapters 178 and 448 of the Wisconsin Statutes. Section 178.03 of the Wisconsin Statutes defines a partnership as "an association of two or more persons to carry on as co-owners of a business for profit." The partnership and every individual acting in the ordinary course of the business of the partnership is liable for partnership actions. Wis.Stat. § 178.10; *see also* Wis.Stat. §§ 178.11 and 178.12. That the Monroe Clinic was a single legal and economic entity at the time

care was denied (January 22, 1988) was never contested. As such, it was entirely incapable, as a matter of law, of contracting, combining, or conspiring with itself. The Monroe Clinic could not possess monopoly power "[b]ecause the essential element of agreement or understanding is missing, [the plaintiff] has failed to establish a violation of § 1 of the Sherman Act...." *Sargent–Welch Scientific Co. v. Ventron Corp.*, 567 F.2d 701, 709 (7th Cir. 1977), *cert. denied*, 439 U.S. 822, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978).

To survive the Rule 12(b)(6) motion to dismiss, plaintiffs were required to allege, and to survive the motion for summary judgment, they were required to present sufficient evidentiary facts to establish that the defendant's allegedly illegal conduct either was "in interstate commerce" or had a "substantial and adverse effect" upon interstate commerce. *McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 241–42, 100 S.Ct. 502, 509–10, 62 L.Ed.2d 441 (1980); *Hospital Bldg. Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 743, 96 S.Ct. 1848, 1851–52, 48 L.Ed.2d 338 (1976). The "allegedly unlawful conduct itself must be shown to 'infect' those general business activities of the defendant which do, or are likely to, effect interstate commerce." *Stone v. William Beaumont Hosp.*, 782 F.2d 609, 613–14 (6th Cir.1986).

Under the law in this circuit the "plaintiff must allege sufficient facts concerning the alleged violation and its likely effect on interstate commerce to support an inference that the defendants' activities infected by illegality either have had or can reasonably be expected to have a not insubstantial effect on commerce." *Seglin v. Esau*, 769 F.2d 1274, 1280 (1985).

As this court has noted, even denial of a physician's staff privileges, which is certainly more far reaching than denial of non-emergency services to two patients, is insufficient to meet the interstate commerce requirement. *Doe ex rel. Doe v. St. Joseph's Hosp.*, 788 F.2d 411, 417 (7th Cir. 1986); *Seglin*, 769 F.2d at 1280. The allegations of the plaintiffs' complaint (and

their proof) of equipment purchases, insurance, and government payments and even travel by patients do not meet the interstate commerce standard. Indeed, such facts have been expressly rejected by this court as insufficient:

> [w]e held that plaintiff's allegations that "the defendants provide psychiatric services to patients who travel in interstate commerce to receive such services, purchase equipment in interstate commerce, and receive insurance payments through interstate commerce ..." were "insufficient to establish the required nexus with interstate commerce."

*Doe ex rel. Doe*, 788 F.2d at 417 (quoting *Seglin*, 769 F.2d at 1279–80).

The plaintiffs present no more than a recast *Seglin* case, with the single physician of *Seglin* now the Nelson family. The reasoning of *Seglin* requires the dismissal of the plaintiffs' antitrust complaint. If they are permitted to proceed, then:

> [v]irtually every physician [every patient] who is ever temporarily denied hospital privileges [non-emergency clinic care] for whatever reason could drag the hospital [clinic] ... into costly antitrust litigation merely by alleging that the defendant receives payments, goods, or equipment in interstate commerce.

*Doe ex rel. Doe*, 788 F.2d at 417 (quoting *Seglin*, 769 F.2d at 1283–84).

In *Seglin*, the plaintiff physician was denied hospital privileges. Although his hospital purchased and participated in a wide variety of activities in interstate commerce, this court's inquiry focused not on the ordinary and common activities of a large medical facility, but rather on the conduct which formed the genesis of that lawsuit—the denial of staff privileges. This court acknowledged that in the 1980's it is inconceivable that a major medical facility does not participate in interstate commerce. The Monroe Clinic is no different than any relatively large business with customers, suppliers, and outlets in different states. The inquiry must focus not on the general activities of the defendant, but on the conduct "infected by illegality." In *Seglin* that conduct was the denial of staff privi-

leges, and in this case that conduct is the denial of non-emergency medical services.

The district court apparently overlooked this court's *Seglin* standard. (*Compare* the district court's first decision, ("plaintiffs' allegations that out of state patients, supplies and employees will be affected ... are sufficient"), the district court's second decision, and the district court's third decision ("defendant has clinics in Illinois and a large percentage of out-of-state patients, thus placing its conduct *in* interstate commerce.")).

The relevant inquiry is whether the effect on interstate commerce of the alleged unlawful activity—denying medical care to the plaintiffs—is, as a matter of practical economics, not insubstantial. *Seglin*, 769 F.2d at 1280. Discovery revealed no effect whatsoever on interstate commerce. The plaintiffs concede that their requirements for medical services have not changed since the action of the Monroe Clinic. They will now travel to Madison, Wisconsin, to obtain the medical care they are unable to receive in Monroe, Wisconsin. Plaintiffs have insurance coverage from Blue Cross and Blue Shield United *of Wisconsin* and whether the insurance payments go to the Monroe Clinic in Green County, Wisconsin, or the Dean Clinic in Madison at Dane County, Wisconsin, will not effect interstate commerce. As to the few dollars these plaintiffs might spend on medicine and supplies, there is no evidence that using physicians in Madison rather than those in Monroe will impact the volume of medicine and supplies in interstate commerce. *See Litman v. A. Barton Hepburn Hosp.*, 679 F.Supp. 196, 202 (N.D.N.Y.1988).

The trial court's finding that the Monroe Clinic's conduct was "in interstate commerce" misses the basic standard of this court. The general conduct of the Monroe Clinic is not relevant but rather the specific conduct is at issue—and that is combining for the purpose of denying non-emergency medical services. As to the effect of that conduct on interstate commerce, the record is abundantly clear that there is no effect at all. As one court observed in a similar case rejecting a claim of interstate com-

merce when a physician was denied cardiology privileges,

> the gravamen of [plaintiffs'] complaint was that defendants illegally excluded him from using a local facility two or three times a month. This court cannot ascertain how such a deprivation has anymore than a *de minimus* impact on interstate commerce. Consequently, the Sherman Act prerequisites simply have not been satisfied.

*Stone*, 782 F.2d at 614. The plaintiffs have failed to demonstrate a not insubstantial effect on interstate commerce.

On the last of the three points here involved, ultimately any federal antitrust action must rest upon a showing of "market power." *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 671 (7th Cir.1985), *cert. denied*, 475 U.S. 1129, 106 S.Ct. 1659, 90 L.Ed.2d 201 (1986) ("This failure [to demonstrate market power] makes every other element of this antitrust case irrelevant."). While that ultimate question of market power may not be reached before a showing of a relevant market (both product and geographic), *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523–24, 8 L.Ed.2d 510 (1962); *Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 480 (7th Cir.), ("It is impossible to monopolize a market that does not exist."), *cert. denied*, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988); *Kayser Aluminum & Chemical Corp. v. FTC*, 652 F.2d 1324, 1330–31 (7th Cir.1981), ultimately the power to control prices or exclude competition is the object addressed by antitrust laws, *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1004–05, 100 L.Ed. 1264 (1956); *Juneau Square Corp. v. First Wisconsin Nat'l Bank*, 624 F.2d 798, 813 (7th Cir.), *cert. denied*, 449 U.S. 1013, 101 S.Ct. 571, 66 L.Ed.2d 472 (1980). The district court in this instance apparently found sufficient basis to believe there was a factual dispute concerning the relevant market and relevant market power without explicitly so stating. The difficulty with examining this apparent conclusion is caused by the district court's failure to state and find whether the relevant product and geographic markets were what the plaintiff contended existed.

The plaintiffs contended variously that it was "medical care"; "primary care" consisting of internal medicine, family practice, general practice, OB/GYN and pediatric medicine; and "primary care" consisting of pediatric, OB/GYN and family practice services. Similarly, they variously considered the geographic market to be Green County, the City of Monroe, the three county zip code area surrounding Monroe, Wisconsin, and a seventeen zip code area. The district court's and the plaintiffs' difficulty in describing the relevant market was to a great measure the result of the plaintiffs' reliance on Harold Luft, Ph.D. as their sole economic analyst/expert. Dr. Luft is the sole qualified source cited by the plaintiffs supporting their allegation of the Clinic's market power. Yet, Dr. Luft conceded that he was "not an expert," that he had no background in antitrust markets, either geographic or product, and that he had no background in "primary care" markets. Dr. Luft further stated that he was not a member of any associations or industrial organization groups which form the bulwark of economists specializing in antitrust law and economics. Where supposed experts have admitted that they are "not experts," courts have had little difficulty in excluding their testimony. *See Dawsey v. Olin Corp.*, 782 F.2d 1254, 1264 (5th Cir. 1986); *Gates v. United States*, 707 F.2d 1141, 1145 (10th Cir.1983); *Will v. Richardson Merrell, Inc.*, 647 F.Supp. 544 (S.D. Ga.1986). Moreover, affidavits which supply faulty analyses do nothing to assist the court in resolving the difficult inquiries and ought to be stricken:

> [t]he importance of safeguarding the integrity of [judicial] process requires the trial [or appellate] judge, when he believes that an expert's testimony has fallen below professional standards, to say so, as many judges have done.

*Mid–State Fertilizer Co. v. Exchange Nat'l Bank*, 877 F.2d 1333, 1340 (7th Cir. 1989) (quoting *Deltak, Inc. v. Advanced Systems, Inc.*, 574 F.Supp. 400, 406 (N.D.

Ill.1983), *vacated on other grounds,* 767 F.2d 357 (7th Cir.1985)).

Since the plaintiffs have conceded or cannot demonstrate that there was an effect on the generalized market or an effect on prices or output, it is not difficult to imagine that an analysis of the market would demonstrate the lack of market power by the Monroe Clinic. It is precisely that conclusion to which the evidence leads.

As the fundamental inquiry of antitrust law focuses upon market power, so too a discussion of market power (*i.e.,* the ability to control price or output) inevitably leads to a consideration of the barriers those entering a market must face. It is fundamental that in order to establish market power, the plaintiffs must show a barrier to entry that prevents competition. "[W]ithout a barrier there is no market power." *Will,* 776 F.2d at 672. As this court observed:

> [t]he use of barriers to entry as a proxy for market power is familiar in the law of mergers. Unless barriers to entry prevent rivals from entering the market at the same cost of production, even a very large market share does not establish market power.

*Id.* at 672 n. 3. Of course, "[u]nless the defendants possess market power, it is unnecessary to ask whether their conduct may be beneficial to consumers. Firms without power bear no burden of justification." *Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.,* 784 F.2d 1325, 1334–35 (7th Cir.1986).

In this instance, the provision of medical care (whether primary or specialized) by medical doctors is the sole "product market" at issue. As a result, it is necessary to investigate what barriers might exist to a medical doctor's entry into the Monroe geographic market. The evidence is overwhelming and unchallenged that the barriers to the entry of physicians into this market are virtually nonexistent. More than 40 physicians not associated with the Monroe Clinic have in recent years been granted privileges at St. Clare Hospital (the sole hospital in Monroe, Wisconsin). The chairman of the board and the president of the hospital emphatically noted that any qualified physician, regardless of other affiliations or lack thereof, can obtain privileges if qualified. Indeed, the board chairman and chief administrator both noted that the hospital's economic motivations require it to "encourage" new physicians to join in order to increase patient volume, and they do so. In view of both the economic motivations of the St. Clare Hospital and the actual number of physicians who have entered into some form of practice in Monroe, it is not surprising that Dr. Harold Luft is the plaintiffs' sole support for the proposition that barriers exist. Contrary to the most fundamental professional standards, Luft concludes that barriers to entry may exist for physicians, though he has "no direct evidence" of any disinclination of other medical doctors to enter this marketplace. Though the plaintiffs hypothesize that the non-availability of staff privileges at St. Clare Hospital is a significant barrier, as "typical medical staff privileges are controlled by the medical staff," this assumption of what is "typical" is wrong; staff privileges are granted at St. Clare Hospital by the Board of Directors not the staff. The supposed plaintiffs' expert had not spoken with a single physician who sought and was denied privileges; indeed, "no licensed medical doctor has been denied privileges...." at St. Clare Hospital.

It is fundamental that the court must find that there are barriers to entry into a market to determine that the Monroe Clinic may have market power. Having failed to find such barriers, the Monroe Clinic simply could not possess "market power" in any legal or economic sense.

In order to determine what product is sold, one must examine "the reasonable interchangeability of use of the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe,* 370 U.S. at 325, 82 S.Ct. at 1523–24. As the Supreme Court has noted:

> [t]he "market" which one must study to determine when a producer has monopoly power will vary with the part of commerce under consideration. The tests are constant. That market is com-

posed of products that have reasonable interchangeability for the purposes for which they are produced. . . .

*du Pont de Nemours*, 351 U.S. at 404, 76 S.Ct. at 1012. Following these reasonable economic definitions, the plaintiffs first considered the product or service provided to be "medical care." Later, however, the plaintiffs altered this definition to allow for "primary care," though it still remains unclear exactly what that "primary care" is. The plaintiffs' failure to define the relevant product market itself is a basis for dismissal of their complaint.

The plaintiffs defined the product market as "all out-patient health care" and "all in-patient health care" and, consistent with those general statements, addressed the concept of "medical care" as their product in answers to interrogatories. In the plaintiffs' Brief in Opposition to a Motion to Dismiss, they described their complaint as one addressing "health care services," and that product definition was apparently understood by the district court as well as by the defendant as encompassing medical care. Of course, in answers to interrogatories the plaintiffs considered medical care to be the "relevant product of service." The deadline for dispositive motions having passed, and the Monroe Clinic having demonstrated the futile nature of the plaintiffs' case in a motion for summary judgment, the plaintiffs then changed their definition during an expert's deposition to "primary care" which definition included internal medicine, family practice, general practice, OB/GYN and pediatric medicine.

If this unending string of changes were not enough, the plaintiffs again changed their definition of the product market to "pediatric, OB/GYN and family practice services, commonly referred to in health care context as 'primary care.'" Product market definition in an antitrust lawsuit is as central as the identity of a product in a product liability lawsuit. Defendants cannot be expected to defend against an ever-changing case.

The plaintiffs nevertheless continued to make changes in the definition. Nothing prior to the summary judgment deadline put the Monroe Clinic on notice that it was to defend against a "primary care" product market definition. Without regard to the numerous problems the plaintiffs have in demonstrating that "primary care" is a relevant product market, all of which are sufficient to sustain the district court, "notice" to a defendant is the single most fundamental principle of a relevant product market in the district court. *See* Fed.R.Civ.P. 7, 8, 12(e); *Globig v. Johns–Manville Sales Co.*, 486 F.Supp. 735, 739 (E.D.Wis.1980); 1 Wright & Miller, *Federal Practice and Procedure*, §§ 12, 15–16 (1982).

The record established by plaintiffs also clearly, as the defendant points out, fails to demonstrate any geographic market. Whichever view is accepted, either by number of doctors or by number of patients, the findings are far below any accepted standard to establish market power.

It also should be noted that belatedly, and over the objection of the defendant, plaintiffs sought to rely on Section 7 of the Clayton Act. 15 U.S.C. § 18. Whether or not the issue is properly before this court is immaterial, as the issues of antitrust injury, interstate commerce and market power are also dispositive of the Section 7 claims.

Turning now to the position taken by the district court that the antitrust statutes are involved but here are not to be applied, it should first be noted that "federal courts have been 'virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.'" *Associated General Contractors of Cal. v. California State Council of Carpenters*, 459 U.S. 519, 534, 103 S.Ct. 897, 906–07, 74 L.Ed.2d 723 (1983) (quoting *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 263 n. 14, 92 S.Ct. 885, 891–92 n. 14, 31 L.Ed.2d 184 (1972)). No matter how broadly one views the potential reach of the antitrust laws it must be conceded "that despite the broad wording of § 4 there is a point beyond which the wrongdoer should not be held liable." *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 760, 97 S.Ct. 2061, 2082, 52 L.Ed.2d 707 (1977) (Brennan, J., dissent-

ing). Section 4 of the Clayton Act, 15 U.S.C. § 15 provides:

> [a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue. . . .

This provision is the operative provision for purposes of the plaintiffs, or any other complainant as they seek damages under the antitrust laws. Recognizing the practical limitations of applying the broad wording of Section 4, our courts have developed two separate, but overlapping, concepts limiting the reach of that section. (Each concept is often referred to as a matter of "standing.") The injury complained of must "be of a type that the antitrust laws were designed to guard against . . . and further that the antitrust violation [must] be the direct cause of plaintiff's injury." *Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549, 556 (7th Cir.1980). *See Lupia v. Stella D'Oro Biscuit Co.*, 586 F.2d 1163, 1168 (7th Cir.1978), *cert. denied*, 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979) ("[n]ot only must the injury be direct, but it must be of the kind the antitrust laws were written to guard against."). These requirements of standing are applicable regardless of the federal antitrust provision upon which relief is sought. *Ball*, 784 F.2d at 1334 ("the 'antitrust injury' rule applies to requests for damages and injunctions alike") (a Section 1 or 2 claim); *Havoco*, 626 F.2d at 556 ("as with all antitrust claims"); *see also In re Industrial Gas Antitrust Litigation*, 681 F.2d 514, 515 (7th Cir.1982), *cert. denied*, 460 U.S. 1016, 103 S.Ct. 1261, 75 L.Ed.2d 487 (1983) (a Section 1 claim); *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (a Section 7 claim).

An injury suffered by a plaintiff must be a "direct" result of the illegal antitrust act. *Repp v. F.E.L. Publications, Ltd.*, 688 F.2d 441, 445 (7th Cir.1982). This standard of "directness," which referred to an issue of "standing"—as here by the district court—or as a "more general requirement" of Section 4 of the Clayton Act, 15 U.S.C. § 15, embodies the same requirement "that plaintiffs establish a sufficient nexus be-

tween the defendant's alleged [anticompetitive] actions and an injury to plaintiffs." *Weit*, 641 F.2d at 469. Similar to the concept of proximate cause in tort law, the allowance of damages in an antitrust matter "despite the broad wording of § 4," *Illinois Brick*, 431 U.S. at 760, 97 S.Ct. at 2082 (Brennan, J., dissenting), is fundamentally limited by the rule that the damages flow out and relate to the anticompetitive act. The injuries must be direct, not "fortuitous," *Brunswick*, 429 U.S. at 487, 97 S.Ct. at 696–97, as "Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action. . . ." *Associated General*, 459 U.S. at 535, 103 S.Ct. at 907.

> As the district court here concluded:

> [i]f the damage was merely incidental or consequential, or if the defendants' antitrust acts are so removed from the injury as to be only remotely causative, the plaintiffs have not been injured "by reason of anything forbidden in the antitrust laws" as contemplated by the Clayton Act.

The importance of this fundamental requirement has been emphasized by this court:

> [i]t would appear the circuits all view the treble damages suit as too lethal a cannon to put in the hands of anyone who has suffered only an "indirect," "secondary," or "remote" injury.

*Lupia*, 586 F.2d at 1168.

Even assuming, as the district court assumed here, that there existed a potential anticompetitive act in the creation of a monopoly by the Monroe Clinic, the district court was unable to find any support in the record for the proposition that the injury—the denial of care—had any relationship with the anticompetitive act. "The [plaintiffs] have provided no affidavit, answer to interrogatory, deposition or other evidence supporting a relationship between the alleged creation of a monopoly and the decision to terminate plaintiff Bowman's care." The plaintiffs apparently misunderstand their obligations under Rule 56. As in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106

S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Monroe Clinic discharged its obligations under the Rule by showing an absence of evidence supporting the plaintiffs' claim. *Id.* at 325, 106 S.Ct. at 2553–54. The plaintiffs may no longer rest upon the allegations of their Complaint, or the speculation that the two acts—monopolization and denial of care—are related. They must present something in this record which ties the events together.

Unlike *Williams v. St. Joseph Hospital,* 629 F.2d 448 (7th Cir.1980), where (a) the courts examined the matter under a Motion to Dismiss; (b) the very objective of a conspiracy between the doctors was the denial of care; and (c) this court did not address the issue of antitrust injuries, *In re Stegall,* 865 F.2d 140, 142 (7th Cir.1989) ("A point of law merely assumed in an opinion, not discussed is not authoritative."), here the matter comes to this court under Rule 56 so that the purported anticompetitive objective must be supported by much more than simple allegation. *See Williams,* 629 F.2d at 453 n. 7. Dr. Raetigg, the Clinic director, and the Medical Center physician involved deny any relationship, and even the plaintiffs are unable to cite to a single document, deposition testimony or other item of proof to demonstrate a tie. The plaintiffs are unable to present any evidence, much less evidence sufficient to create a "genuine issue of material fact," relating the act of the Executive Committee of the Monroe Clinic on January 21, 1988, to choose not to treat the plaintiffs, to the allegedly antitrust act of creating a monopoly.

Certainly obtaining medical care may be more inconvenient here but that inconvenience and its related costs to the plaintiffs are at best remote, and the indirect result of the prior conduct (monopolization) to which the antitrust laws apply. Those added costs, resulting in part because the plaintiffs travel farther than they would have traveled had the Medical Center of Monroe, not been acquired, are not themselves sufficient to justify a cause of action. The existence of real damages is not the issue, *see Associated General,* 459 U.S. at 523, 103 S.Ct. at 900–01 ($25 million damages); *Brunswick,* 429 U.S. at 481, 97 S.Ct. at 693–94 ($2.3 million lost profits); *Repp,* 688 F.2d at 441 (money losses for music licensing); *Lupia,* 586 F.2d at 1168 (lost revenues), it is the relationship of these damages to the illegal act which may make them antitrust injuries. The plaintiffs' damages simply "did not result from the defendant's acquisition or exploitation of market power." *Industrial Gas,* 681 F.2d at 519.

As stark as the failure of the plaintiffs to demonstrate a relationship of an anticompetitive act of the cost associated with the denial of care, is the relentless repetition by the plaintiffs describing what they view as the heinous character of the result of the Clinic's action. The plaintiffs' outrage, however, does not translate into anticompetitive conduct; on the contrary, as the Supreme Court admonished:

> [t]he injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations ... would be likely to cause."

*Brunswick,* 429 U.S. at 489, 97 S.Ct. at 697–98 (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 125, 89 S.Ct. 1562, 1577–78, 23 L.Ed.2d 129 (1969)). The plaintiffs' claim fails to recognize the most fundamental of all issues in antitrust law that, an antitrust injury "means injury from higher prices or lower output, the principal vices proscribed by the antitrust laws." *Ball,* 784 F.2d at 1334. *See also Associated General,* 459 U.S. at 538, 103 S.Ct. at 908 ("The Sherman Act was enacted to assure customers the benefits of price competition...."). The plaintiffs have yet to explain how the denial of care might plausibly be considered related to anticompetitive price and output decisions. Simply to restate that the plaintiffs must go farther for their care than they would if another physician group existed in Monroe does not relate the denial by the Clinic to pricing or output decisions. The relationship is at most "fortuitous." *Brunswick,* 429 U.S. at 487, 97 S.Ct. at 696–97.

The admonition that the antitrust laws are intended to encourage competition is often restated.

> Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise.... And the freedom guaranteed each and every business, no matter how small, is the freedom to compete—to assert with vigor, imagination, devotion, and ingenuity whatever economic muscle it can muster.

*United States v. Topco Associates, Inc.*, 405 U.S. 596, 610, 92 S.Ct. 1126, 1134–35, 31 L.Ed.2d 515 (1972). The "ruthless" process of competition, *Ball*, 784 F.2d at 1338, is a natural byproduct of that free market system, as is the conclusion that "the intent to preserve or expand one's market share is presumptively lawful." *MCI Communications Corp. v. American Telephone and Telegraph Corp.*, 708 F.2d 1081, 1113 (7th Cir.), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983).

It is the public injury to competition, not the private injury to single individuals, that is addressed by the antitrust laws. Only those injured by anticompetitive conduct affecting the marketplace are compensated under these laws. *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir.1984), *cert. denied*, 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985) ("Thus, the plaintiff must allege, not only an injury to himself, but an injury to the market as well."); *Havoco*, 626 F.2d at 558–59. Despite the unanimous requirement of our courts that there be a generalized injury to the marketplace before an individual may recover damages, the plaintiffs concede that they can prove no deleterious effect on the market. As this court noted, "it is the function of § 1 to compensate the unfortunate only when their demise is accompanied by a generalized injury to the market." *Car Carriers*, 745 F.2d at 1109.

The sole known result of their supposed unlawful anticompetitive action of monopolization is the denial to the plaintiffs of non-emergency medical care. Yet, the very essence of a claim under the Sherman Act is the requirement that the plaintiff prove a significant adverse impact on competition in the relevant market of the activities violating the antitrust laws, and not simply effect on a single consumer. *United States Trotting Ass'n v. Chicago Downs Ass'n*, 665 F.2d 781 (7th Cir.1981) ("[O]ur cases consistently hold that a plaintiff ... must prove adverse impact in the relevant market...."); *Contractor*, 638 F.2d at 1078; *Juneau*, 624 F.2d at 811; *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 268 (7th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982) ("It is now well established that any rule of reason analysis requires a showing of anti-competitive market effect. To hold otherwise would ignore the very purpose of the antitrust laws which were enacted for the protection of competition, not competitors."). *America's Best Cinema Corp. v. Fort Wayne Newspapers, Inc.*, 347 F.Supp. 328, 333 (N.D.Ind.1972).

When faced with a single disgruntled plaintiff affected by the acts of a defendant in an antitrust action this court has concluded that, "a loss by the plaintiff of a single contract with a single purchaser is simply not equivalent to a deleterious effect on the market." *Havoco*, 626 F.2d at 558. Nonetheless, it is precisely that single event which the plaintiffs asked the district court to find sufficient to meet the requirements of injury to the marketplace. Absent other proof, the plaintiffs failed to carry their burden.

The conduct of the Monroe Clinic is, if anything, typical of a group of doctors faced with increased competition. It is certainly expected, and businesses are encouraged by the courts, to take steps ·to improve efficiency, profitability, and sales, *Sargent–Welch*, 567 F.2d at 712. Viewed from a purely economic perspective, the actions of the Monroe Clinic, as the district court judge found in this instance, were not indicative of an anticompetitive marketplace.

Professional malpractice actions present a perceived economic threat to the physicians' businesses. "Medical Malpractice—1985: Reflections of a Health Care Provider," *Journal of the Kansas Medical Society*, Vol. LXXXV, No. XII, December 1984,

p. 323–29. ("The malpractice problem is again approaching crisis proportions, impacting upon patients, competent providers, law, the insurance industry, the economy, government and society"); "Response of the American Medical Association to the Association of Trial Lawyers of America Statements Regarding the Professional Liability Crisis," *American Medical Association Special Task Force on Professional Liability Insurance,* August 1985, p. 4; "Doctors and Lawyers Spar Over State Malpractice Litigation," *The Business Journal* (Milwaukee, Wisconsin), October 7, 1985; "Malpractice Premium Expenses: Another 'Crisis' and its Implications," *Journal of Medical Practice Management,* Vol. 3, No. 3, page 163, ("There is a sense that another malpractice insurance 'crisis' is either upon the medical profession or quickly developing. Rapid increases in the frequency and severity of claims experience are once again being cited by those concerned.") Though a variety of groups may argue about the extent of the cost of malpractice actions, there can be no doubt that they affect the profitability of a medical practice. As a consequence it makes good business sense to choose not to treat patients who are more likely than not to file a frivolous medical malpractice case. The Monroe Clinic does not terminate care to all malpractice litigants; on the contrary, these plaintiffs represent a single case in the history of the Monroe Clinic. This particular malpractice case was unique in the view of the Monroe Clinic, because it was entirely meritless and because it was pursued beyond the point where its lack of merit should have been obvious. Viewed from an economic standpoint, no matter how well it conducts its practice by providing highest quality care, the Monroe Clinic has no ability to prevent meritless litigation of the type previously pursued by the plaintiffs. Viewed from this perspective the Monroe Clinic's action was consistent with a competitive market decision to lower its potential economic risks.

Moreover, it could be argued that as the profitability of a clinic narrows the economic incentives increase on the clinic to reduce risks by denying care to potential malpractice litigants. Even the plaintiffs' purported economic expert agreed when asked, "[i]t would be more likely in a competitive market, rather than an uncompetitive market from an economic standpoint to turn down the person [malpractice litigant] for care, wouldn't it? Answer: "[P]robably true." Ironically even if the plaintiffs are correct in believing they pose no economic risks to medical care providers, then the denial of care may itself be a "pro-competitive" act by encouraging others to enter the market to treat the plaintiffs. The plaintiffs failed to present to the district court any evidence that the conduct alleged was anything but consistent with a competitive market. As one court has observed, "an antitrust plaintiff opposing a motion for summary judgment must present evidence that tends to exclude the possibility that the defendant's conduct was as consistent with competition as with illegal conduct. *Indiana Grocery, Inc. v. Super Value Stores, Inc.,* 864 F.2d 1409, 1412–13 (7th Cir.1989).

The plaintiffs' sole attempt to address the purposes of the denial by the Monroe Clinic certainly support the proposition that no anticompetitive effect has occurred or was intended. To the plaintiffs this case is about a "doctor with a vendetta," "revenge," and "a bully." They theorize that Dr. James Raettig, one of the defendants in the 1986 malpractice action, carried out a plan of "punishment" by waiting for the Monroe Clinic to become large enough before denying care so that the "punishment" could be more extreme. Forgetting for the moment the preposterous character of this theory in light of the nearly 174,000 doctor/patient visits annually, and lack of any citation to supportive proof in the record, the plaintiffs have yet to explain how that motivation is even within hailing distance of the purposes of the antitrust laws. Such "evil" motivations have nothing whatsoever to do with the pernicious anticompetitive conduct addressed by our antitrust statutes.

The act of choosing to serve patients certainly deserves the same protection af-

forded other rights of contract. *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). The refusal to treat a particular patient is not, itself, an antitrust violation as courts have uniformly upheld the right of a single entity to refuse to deal with customers, even when the refusal has been in retaliation for a customer's non-conforming conduct. *See, e.g., Lamb's Patio Theater v. Universal Film Exchanges, Inc.*, 582 F.2d 1068 (7th Cir. 1978). Contrary to the plaintiffs' assertion that a refusal to provide care as a response to use of the courts to enforce their rights, courts have specifically upheld unilateral refusals to deal imposed in response to antitrust and other lawsuits. *See, e.g., House of Materials, Inc. v. Simplicity Pattern Co.*, 298 F.2d 867 (2d Cir.1962); *Zoslaw v. CBS, Inc.*, 1978–2 Trade Cas. (CCH), ¶ 62,269 (N.D.Cal. Sept. 26, 1978). Even a monopolistic entity may unilaterally refuse to deal. *Sargent–Welch*, 567 F.2d at 701; *America's Best*, 347 F.Supp. at 328. The motives attributed by the plaintiffs to the acts of the Monroe Clinic are simply not intended for redress under our antitrust statutes.

The record is replete with motivation consistent with a single physician group's—the Monroe Clinic's—common sense view of medical malpractice litigation. Where a patient pursues a malpractice action, particularly one that is meritless (as this 1986 case was viewed from the start by the Monroe Clinic) it must be conceded that the patient has voluntarily terminated the professional relationship of doctor and patient. The plaintiffs' attorney in the malpractice case, after nearly two years of discovery, conceded he had no case against the Monroe Clinic. *See Williams*, 629 F.2d at 450. ("It might be against public policy as involving something akin to a conflict of interests to compel a physician to continue to serve a patient who has filed a malpractice suit against him.") That doctor/patient relationship is based, at the very least upon trust, and the patient's election to accuse the medical group and doctor of violating that trust terminates the relationship. The Executive Committee of the Monroe Clinic considered the matter at length under an established "policy and procedure for withdrawal from care." The denial then followed under established professional guidelines, and the clinic made a judgment as professionals to decline care as a clinic. The plaintiffs seem consistently to forget that the Monroe Clinic itself was one of the defendants in their malpractice action.

Consistent with their professional obligations, each malpractice or patient misconduct incident (*i.e.*, threats to staff, refusal to take medicine, failure to arrive for appointments) brought to the Executive Committee is an individual case considered with a policy emphasizing the individual character of that case. Despite the plaintiffs' indignation, they can point to no support in this record that would find a general policy to deny care to malpractice litigants. This case is a case of one. Having been accused of malpractice, the clinic chose to terminate services because it believed the doctor/patient professional relationship had been breached. Certainly, doctors retain the right, as a matter of law, to terminate relationships with patients.

Such terminations, when not the part of any overall plan of market control, are clearly not indicative of anticompetitive conduct. This is certainly not the "bold, relentless, and predatory commercial behavior" to suppress competition at which the antitrust laws are aimed. *Lorain Journal Co. v. United States*, 342 U.S. 143, 149, 72 S.Ct. 181, 184, 96 L.Ed. 162 (1951). The district court, faced with overwhelming proof, properly entered judgment against the plaintiffs whose "unsubstantiated speculation" simply is not sufficient to create a genuine issue of fact.

For the reasons I have stated, perhaps at too great length, I strongly feel that the judgment of the district court should be affirmed.